Argued and submitted July 3, reversed November 14, 2001

In the Matter of Andrew Stephens,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

ANDREW STEPHENS,
*Appellant.*

0003-63052; A109849

35 P3d 1061

Paul L. Breed argued the cause and filed the brief for appellant.

Katherine H. Waldo, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Appellant appeals from an involuntary mental commitment order. ORS 426.130. He makes two assignments of error, one of which has already been decided adversely to him in *State v. Cach*, 172 Or App 745, 19 P3d 992 (2001). In his other assignment, appellant contends that the evidence is insufficient to show that he is unable to meet his own basic needs. We agree and reverse.

Appellant is a 21-year-old who was brought before the court in March 2000 for an involuntary civil commitment hearing after having voluntarily sought treatment at a medical center. During his voluntary hospitalization, appellant was found hiding in another patient's room. He was very agitated and as a result a "hold" was placed on him. Appellant has been diagnosed in the last year with a schizoaffective bipolar disorder. He has been prescribed two medications that appear to control the worst of his symptoms, including "manic phases." During those phases, he suffers from abnormal fear and reactions in ordinary social and public settings. At some time in the months before the hearing, appellant decided to stop taking his medications as an "experiment," because he believed he was able to be more "sane" without them. At the hearing, evidence was adduced that appellant had made one suicide attempt, more than a year before the hearing. He had been living with family members during the year after his diagnosis. He has not held a job in recent months and was not receiving public benefits other than unemployment benefits that had expired before the hearing date.

In the past, appellant had worked at various jobs, some lasting less than a week, for brief periods of time. He had completed one year of community college and had attended one class at Portland State University. In the recent past, he continued to maintain friendships with acquaintances from high school and was able to use the telephone, the bus system and other forms of public transportation. Appellant testified that if he were released immediately following the hearing, his plan was to contact one of two specific friends, Ian or Charlie, and make a request to stay with

either of them. He explained that Charlie had already offered to let appellant stay with him. He also said he would be able to find shelters in Portland where he could stay, and that he would try to find the "quickest" job that was available to begin making money to support himself. He expressed a strong desire to have an independent lifestyle, and although he wanted to return to his father's home to live, he recognized that that option was not available to him.

At the hearing, appellant was able to converse fairly articulately about his beliefs, perceptions, and diagnosis, as well as his need to continue taking medications. He repeatedly assured the court that his "experiment" with refusing to take his medications was a one-time lapse in judgment that would not occur again. He also assured the court that he was sleeping and eating adequately and that he was physically healthy. He was able to recite the name of his nurse practitioner who prescribes his medications, his case manager at the clinic, and the locations of pharmacies where he would be able to refill his prescriptions. He also acknowledged that he would have to get financial assistance, possibly from Social Security.

Appellant's parents testified at the hearing, as did Greg Monaco, the precommitment investigator. Monaco testified that appellant has expressed beliefs over a period of time that he is being subjected to surveillance by satellite and that he receives personal messages through television broadcasts. His fear for appellant was that the "every-second TV surveillance that could be God's voice that [appellant] described, if that resumes for him, I'm concerned about a downward spiral." Monaco testified that appellant had expressed to him a desire to return to either his mother's or father's home to live and that he had not mentioned staying with his friends. Monaco stated that, if released that day, another fear about appellant would be that,

"if he had experience being homeless, living in shelters, this kind of thing, I might be—if he was more street smart, I might be less concerned. But that will be so stressful for him, I think, that I do—I am concerned that he just wouldn't be organized enough to follow through."

Monaco indicated that he did not believe that there was an imminent threat of suicidal behavior, only of a "spiraling down" into depression and a lower level of functioning. He concluded, "I'm not suggesting that [appellant] needs to stay in the hospital for six months or five months or even one month. And that's why I felt like it would have been in his best judgment to take a—well, I was thinking a set-over."

Appellant's mother testified that appellant "is able to behave in such a way that he might try to appear like he's doing better than he really is." She believed that he still has delusional thoughts and that his plans for living with a friend were unrealistic because the friend did not understand how serious appellant's illness is and would not be able to supervise appellant as closely as is needed. She said that appellant had asked her to buy him a condominium in the KOIN tower in Portland so that he would have a place to stay upon his release that would be located near his family and friends. She testified that when she reminded appellant that he did not have any money with which to meet his needs, he told her that he would be able to get a job immediately. She also testified that appellant believes that he is engaged to be married to a high school classmate, whom appellant has not seen for years. When asked, "If he was released and he did have to stay on the streets, [do] you think he'd be able to get to a shelter and find nourishment and be able to feed himself?" mother responded:

"I think he would be able to find a shelter, but I think it would be—like [Monaco] said, it would be very stressful for him. He's never been in that situation. He's always lived with people. I would be very concerned for him to be out there. He's not completely rational at this point in time. And I can't say that I would feel that he would use good judgment out on the street."

When asked what kind of poor judgment appellant might exercise, mother testified, "The thing that is the scariest to me is that I don't know what he would do. He may think he's doing something rational, but he's not quite there yet." She also stated, that "[appellant] can get by day-to-day" but that "he relies heavily on other people to help him get by."

Appellant's father also testified as to appellant's current condition and recent history. He explained that appellant had been living with him, along with sibling's family, and that, while appellant had not threatened to harm or actually harmed anyone, father was concerned that appellant did not know how to play gently and safely with the nine-month-old child in the home. When asked, "Do you have any opinion about your son's ability to meet his basic needs if he's doing so independently? Do you think he's able to do that?", father responded, "He has no source of income. If he had some income, I would be more inclined to say he might be able to survive. But he's relied on me for food and shelter for close to a year." Father also said that he did know Charlie, with whom appellant intended to stay, that he believed friends might provide immediate shelter to appellant, and that appellant could qualify for food stamps and other public assistance benefits. Father also testified that appellant has done some independent shopping for food and that he often buys non-nutritious food. He stated that he believed appellant might continue to take his medication if he had a "good enough scare into him with this hospitalization."

The record also contains the reports of two mental health examiners, Erickson and Mohler, who were present at the hearing and who observed appellant firsthand. In their reports to the court, they summarized the testimony that they heard from mother, father, Monaco and appellant, and then offered their conclusions as to his ability to care for himself. Erickson checked a box on the form to indicate that in his opinion, appellant was not dangerous to others, might be dangerous to himself, and was unable to provide for his basic needs. The written portion of his report states:

"20-year-old Caucasion male who presents in a neat, casual manner. He admits to mental illness and the need for medication. He describes his mental state and the need for medication. He describe his mental state prior to being hospitalized as fearful that, 'I was going to be killed.' He denies any current paranoia or need to protect self. He is somewhat delusional about family members. He does understand he cannot return home but states he will stay with friends, although he has not made any arrangements for housing. Insight is minimal with some poor judgment.

He has no financial resources. He has never lived independently or been homeless. Denies any internal stimuli. Reports no disturbance in sleep or eating habits. There [are] no known medical conditions. [*sic*] He does endorse beliefs that satellites are monitoring his behavior as well as everyone else. Admits to receiving messages from God, the TV or radio but they only give him information.

"* * * * *

"His mental state is fragile, continues to respond to internal stimuli receiving messages from God, TV and radio that give him information. He has never lived on streets without family resources, although there is little evidence of present dangerousness, he has no adequate plan for * * * and unlikely to maintain safety without supervision and structure."

Examiner Mohler concluded that appellant was not dangerous to himself or others, but that he was unable to provide for his basic needs. His narrative report reads:

"21-year-old Caucasian male with diagnosis of psychosis, NOS - 'I was in fear for my life when left Rylos [treatment center] recently. I felt fine, my family didn't agree. I agreed I'll feel more safe in a hospital. I was afraid of anything. I would live with my father if I had my choice, but that's not available. Current medications are working, I needed [them]. Medication is my way of relieving stress. I need them and I intend to continue taking them.'

"He didn't appear to pose danger to self or others. In this regard he denied both, in a straight-forward manner. He still feels paranoid about being monitored, but he feels his family has been watching over him and he recognizes the need for continuing his medications. The same is true from getting messages (support) from the TV - 'It is God speaking.' His ability to meet his basic needs may be questionable and he never has been on his own.

"* * * * *

"He mentioned having had a bi-polar affective disorder but his delusions could indicate schizophrenia or psychosis, NOS. The fact he has a mental problem with delusions is apparent.

"He denies posing a danger to self and others but his delusions and system of beliefs argue for inability to keep out of harm's way and/or take care of himself."

■ ORS 426.130(1) provides, in part:

"After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"(a) Not mentally ill, the person shall be discharged forthwith.

"* * * * *

"(b) Mentally ill based upon clear and convincing evidence, the court:

"(C) May order commitment of the individual to the Mental Health and Developmental Disability Services Division for treatment if, in the opinion of the court, subparagraph (A) or (B) of this paragraph is not in the best interest of the mentally ill person."

"Mentally ill person" is defined in ORS 426.005(1)(d) as a person "who, because of a mental disorder, is one or more of the following: (A) Dangerous to self or others. (B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health and safety."

The standard to which the evidence must rise, for the purpose of an involuntary mental commitment, is "clear and convincing." ORS 426.130. "Clear and convincing evidence" means that the "truth of the facts asserted is highly probable." *State v. Jayne*, 174 Or App 74, 77-78, 23 P3d 990, *rev den* 332 Or 316 (2001). In *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992), we explained:

"The legislature's 'basic needs' commitment standard focuses on the capacity of the individual to survive, either through his own resources or with the help of family or friends. The state must establish by clear and convincing evidence that the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life. The statute does not express a standard by which the imminence of the threat to life is to be measured.

"A speculative threat, such as the failure to take medicine under the circumstances in *State v. Brungard*[, 101 Or App 67, 71, 789 P2d 683, *mod on recons* 102 Or App 509, 794

P2d 1257 (1990)], is not by itself sufficient. However, the state need not postpone action until the individual is on the brink of death. The goal of the commitment statute is safe survival, not merely the avoidance of immediate death." *Bunting*, 112 Or App at 145.

Some of the most probative evidence of appellant's condition are the reports of the mental examiners who observed appellant at the hearing and who drew conclusions about his condition from his responses and demeanor, as well as from the statements of other witnesses. Appellant's delusions are central to their ultimate conclusions. Even considering the portions of those reports that support the examiners' conclusions, we are unconvinced that the state has proved that it is highly probable that appellant is unable to meet his basic needs because of his delusions. Neither examiner pointed to delusional *behavior* that persuasively demonstrates appellant's inability to meet his personal needs. Although both examiners focused heavily on appellant's failure to have secured suitable housing as of the date of the hearing, the record shows that appellant had not yet been forced to confront that situation. He had been living with his father until his most recent hospitalization. Appellant's uncontroverted testimony was that he could stay with a long-time friend, Charlie, for the short term. That plan is fairly consistent with the plans of many 21-year-olds—to live with a friend in an apartment, try to find work, and be independent. The record also shows that appellant has lived outside of his parents' care for periods of time in the past, that he "paid bills," and that he managed his own finances during that time.

Another issue of concern is appellant's ability to generate a source of income. However, the record shows that appellant has worked in the past, that he recognizes the need to get a job and work, and that he is probably eligible for various forms of public assistance. Without a stronger showing that his mental illness causes him to be unemployable, appellant is in no different situation from many unemployed young adults who are not attending college and while his lack of present income is a cause of concern, the record shows that he is eligible for public assistance.

Finally, the examiners were concerned about whether appellant would be willing and able to continue taking medications as prescribed. Significantly, appellant initially sought voluntary treatment. Evidence at the hearing showed that he is capable of seeking out medical attention and refills of his prescriptions on his own and that he was not unwilling to seek help when he began to feel overwhelmed. His father testified that appellant might have been scared enough by the most recent set-backs in treatment to resume his medication regimen voluntarily and to take his medications consistently. In the hearing, appellant himself recognized his need to continue his medication regimen and assured the court that he was going to do so. Although neither we nor the trial court is obliged to accept his assurances, there is no evidence demonstrating that he is unwilling to take his medication because of his mental illness.

Father's testimony also showed that appellant is capable of shopping for food and that, while appellant may not make responsible, nutritious decisions about food, there is no evidence that appellant's physical state is such that it constitutes an imminent threat to his life. Finally, there was no evidence in this record that appellant is creating or is involved in situations that are dangerous to himself. There is no history that he takes harmful action as the result of the directives that he believes he receives from the television or from God. In fact, father's testimony, when asked how appellant might harm himself, was that "I think he could do it accidentally, hurt himself," but that he does not think he would intentionally harm himself. While father told the investigator that appellant might "run into the street," and be harmed, there is no evidence of appellant ever engaging in such dangerous behavior, and there is evidence that he is able to use public transportation without difficulty.

In summary, we do not find it highly probable that appellant's mental illness prevents him from providing the basic needs of food and shelter for himself. To comply with the requirements of ORS 426.130, the state must demonstrate that appellant's mental illness causes an inability to provide for basic needs. That nexus has not been demonstrated here to the degree required by the statute. Rather, while less than optimal, appellant's plan for survival (living

with a friend, seeking work or public benefits, and taking his medications) appears to be within his capabilities. Consequently, the trial court erred in ordering his involuntary commitment.

Reversed.