Argued and submitted November 29, 2001, reversed May 8, 2002

In the Matter of Michael D. Webber,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

MICHAEL D. WEBBER,
*Appellant.*

00M0042; A111563

45 P3d 1046

James A. Palmer argued the cause and filed the brief for appellant.

Kathryn T. Garrett, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

Deits, C. J., dissenting.

### EDMONDS, P. J.

In this mental commitment proceeding, appellant challenges an order committing him to the custody of the Oregon Mental Health and Developmental Disability Services Division. He makes two assignments of error. First, he argues that the trial court's advice of rights was insufficient under ORS 426.100 because the court failed to tell appellant of his right to subpoena witnesses. Second, he contends that there is not clear and convincing evidence of his dangerousness to himself or others. We reverse on the ground that the evidence is insufficient to support a finding that appellant's mental illness causes him to be a danger to himself or others, without reaching the first assignment of error.

Appellant is 28 years old, and he suffers from a bipolar type of schizoaffective disorder. He has a history of civil commitments based on findings that he has been dangerous to himself or others, but the record in this case is devoid of evidence of the circumstances surrounding those commitments. During the time in question, he was on a prescription regimen of medicines through the Josephine County Mental Health Department, but he had not been consistent in taking those medications in the year before the hearing.

This commitment occurred after an altercation during a family picnic on August 2. The outing included appellant, his parents, his older brother Donald, and some extended family members. Appellant had taken his medication only sporadically in the week preceding the outing, and he was in an excited state because of the family outing. Appellant and Donald, had not seen each other for several years. Appellant consumed a 24-ounce beer very quickly, early in the outing. Then, during a brief discussion with Donald, appellant became angry when Donald asked him if he was still taking his medications. Appellant testified that he is very embarrassed about his mental health and that the question made him angry because he felt that he had been conversing normally with his brother and that Donald had no reason to bring up appellant's mental health in front of his family. Appellant got up, left the area where the conversation

had occurred, and began to goad Donald to fight with him. Appellant also swore at his mother and father when they tried to intervene and then began to swear at and to use profane gestures toward Donald. Donald stood up to put on his shoes, which appellant perceived as a response to his invitation to fight. Appellant's father encouraged Donald to sit down to avoid a confrontation. His father later testified that he had "talked Donald out of" responding to appellant's goading. Appellant then left the area, walked to a convenience store, and bought and consumed another large beer. Donald loaded his family into their car and left the area as well.

Soon thereafter, appellant returned to the scene of the family picnic and got into the car with his parents. He continued to swear at his parents and to act out of control, even after he was asked to calm down or get out of the car. On the drive home, appellant made comments that there was going to be trouble because "it's not over yet." He also made comments about "chopping" Donald in the throat, making him suffocate, and getting a knife and stabbing him. Appellant was talking rapidly and repeating himself. The father testified that appellant continued to say that "there was going to be some form of confrontation when the two of them [Donald and appellant] got together."

When the family arrived home, appellant and his parents went into the parents' house and appellant had something to eat. He then went to the room where he was staying, closing the door behind him. Donald dropped off his family at another relative's house and then went to the parents' house. He went uninvited into the room where appellant was resting and began another conversation with appellant. Appellant was reclining on the bed without his eyeglasses on. Although Donald reported that the conversation began as an attempt to reconcile with appellant, he said something at one point to the effect that he had been hearing things about appellant's behavior, that he was now seeing it for himself, and that he had even heard that appellant had hit their father. Appellant made a flippant remark in response, and the discussion again became heated. Appellant repeatedly asked Donald to leave the room. When Donald would not leave, appellant attempted to push Donald out of the room. Donald then hit appellant twice, hard enough to

cause him to bleed. Appellant went to the bathroom to clean himself up. Donald followed appellant into the bathroom. While in the bathroom, appellant muttered under his breath to Donald that he hoped Donald, a police officer, would get hurt in the line of duty. Another physical altercation broke out, with Donald again hitting appellant twice. Appellant was again injured. Appellant called the police, who took him to the hospital.

During an interview on August 3 with Thor, a case manager for the mental health department, appellant was too excited to stay focused on answering Thor's questions. He repeatedly demonstrated, through dramatic physical gestures, how the altercations had occurred, and he blamed his brother for the occurrence. In a second interview with Thor on August 4, appellant was oriented to time and place, was able to focus on Thor's questions, and explained that he had been drinking during the incident. He also demonstrated greater insight into his role in the incident. On August 8, the day before the commitment hearing, appellant was interviewed again, this time by Brown, a court-appointed examiner. At that time, he was able to explain more about his thought processes and his understanding of the incidents leading to his hospitalization. He accepted some responsibility for his actions and acknowledged that he had been in a manic phase for about six weeks. He also explained that he believed Donald was largely responsible for the altercation and that he had responded out of anger to Donald's provocations. Appellant alternated between wanting medications for his illness and desiring not to be involved with mental health treatment.

At the hearing, Donald and appellant's father testified about the above events. The father testified as to a general fear among the family about appellant's unpredictable behavior because of the events. Donald testified as to his recollection of the interaction between himself and appellant and related that he had, in fact, asked appellant whether he was taking his medication at the very beginning of their conversation. He testified that he had then been "hurt" by appellant's verbal comments at the picnic and that he was thinking about the possibility of having to "contain" appellant because of his personal experiences as a police officer with

"major drug users down south." Donald also testified that appellant was "very calm" when he went into appellant's room and that appellant asked him repeatedly to leave the room before appellant tried to push him out of the door. He did not contradict appellant's testimony that he had in fact initiated the physical confrontation in appellant's room, nor did he contradict appellant's testimony that he had physically struck appellant in the bathroom. Nothing in Donald's testimony established that he had been injured by appellant in any way during any of the altercations.

In his testimony at the hearing, appellant acknowledged some responsibility for the incidents, that he had a mental illness, and that he was not taking his medications regularly. Appellant also explained that, on the car ride home from the outing, when he alluded to the fact that "it wasn't over," he meant that he believed Donald would initiate further violence because "Donnie stood up" and appellant knew, "just looking at him when he stood up, that there was going to be trouble." He explained that he was "thinking the whole way home there's going to be trouble" and that he had gone to his room alone to avoid any more confrontation and to lie down so that his parents would allow him to "stay and visit with my brother." Appellant apologized to his brother during the hearing for his part in the altercations. He explained that he had overreacted to his brother's comments, but pointed out that he had not been the physical aggressor in the altercations. Appellant said that he could understand Donald's fears and could relate to Donald's desire not to have an incident occur in front of his family but again asserted that Donald had initiated the physical contact. He explained,

"I wasn't fighting back. I was just asking him to stop the whole time—pushing him off, ask him to stop.

"* * * I tried to push him out of my own room * * * so I could go to sleep, because I didn't want an altercation.

"I knew I was wrong at the lake and I didn't want to talk about it. I felt real bad about it and I know it was wrong, and I wasn't ready to throw it on the table and discuss it with my parents or, you know, do the right thing yet, if it would come to that, but —.

"So after he said I'm going to put you out * * * my parents came in there * * * I never threw a punch or anything like that. I did push him to try and get him out of my room.

"Anyway he finally let me go, I went into the bathroom and I said—I was washing the blood off me, and [he] came by and I said something really vicious. And my assault that time was a verbal assault, you know, it wasn't a push, it was a verbal assault, and he went smack and smack, and hit me two more times.

"My parents saw it. They were coming around the corner and he goes 'he swung on me, he swung on me', and I didn't, right. And then I said, that's it, it's over, I'm calling the police, because I was—had blood from head to toe. The policeman came. There was blood on the—pools of blood on the carpet, mine. He didn't have a scratch on him, because I never threw a punch, I never fought back, and because I knew, again—say that again, at the lake I was wrong."

Appellant also interrupted the proceeding several times during testimony of others, trying to explain what he had been thinking or what he had meant by his statements that others were relating.

Brown concluded that appellant was mentally ill and was dangerous to others. The trial court also found that appellant was dangerous to himself and to others. The court ruled:

"I do find that you are mentally ill. And at this time I also find that you are not only a danger to others but a danger to yourself, that you are not able at this time to voluntarily participate in a program of treatment that is appropriate and necessary to stabilize you."

The trial court did not state that it found a nexus between appellant's conduct and his mental illness.

■■ ORS 426.005(1)(d) defines a "mentally ill person," in part, as one

"[w]ho, *because of* a mental disorder, is one or more of the following:

"(A) Dangerous to self or others." (Emphasis added.)

To support involuntary mental commitment, the evidence must establish that the facts that establish one of the

grounds under ORS 426.005(1)(d) are "highly probable." *State v. Stephens,* 178 Or App 31, 38, 35 P3d 1061 (2001). Also, there must be persuasive evidence, established by expert testimony or otherwise, that there is a "causal nexus between the mental disorder and at least one of the ORS 426.005(1)(d) criteria." *State v. Gjerde,* 147 Or App 187, 192, 935 P2d 1224 (1997). In *Gjerde,* we said, "The statute expressly requires that there be a causal connection between the alleged mental disorder and the danger to self[.]" *Id.* In that light, we review the record in this case *de novo.* ORS 19.415(3).

The record contains ample evidence that appellant was in fact injured during the fight with Donald and that the physical altercation between him and Donald was serious, requiring police intervention and the treatment of appellant for physical injuries. While Donald did not appear to be injured, it is clear that the fight was dangerous to both brothers because of the intensity of emotion and physical force involved. What is less clear is whether the evidence satisfies the nexus or causation requirement by the requisite burden of proof.

■     We find little in this record to show that appellant's actions or reactions toward Donald were caused by, or linked to, his mental illness. Rather, they could as reasonably be the result of his brother's instigation of the fight at the house or appellant's consumption of alcohol. In fact, Thor testified that, as a result of his interviews, he did *not* form the perception "that [appellant] was a danger to himself so much as that he was mentally ill." As the governing statute makes clear, a person must be more than mentally ill in order to be committed involuntary—the person must also be dangerous to self or others *as a result of* the person's mental illness. ORS 426.005(1). While neither Donald nor appellant acted admirably, we cannot find on this record that appellant acted that way *because of* his mental disorder. The fact that two brothers, one apparently healthy and one apparently mentally ill, both reacted harshly to each other's comments and gestures, and the fact that both engaged in a physical altercation, is not by itself clear and convincing evidence that appellant's mental illness is what caused him to be a danger to others or himself.

The dissent would hold that there is clear and convincing evidence to find appellant dangerous to others because of his mental illness. In essence, the dissent makes three assertions. First, the dissent argues that "the evidence of what occurred demonstrate[s] the necessary relationship" between the conduct and the mental illness. 181 Or App at 245 (Deits, C. J., dissenting). Second, the dissent contends that "the two mental health experts * * * specifically found that, due to his mental disorder, appellant was a danger to others." *Id.* at 245 (Deits, C. J., dissenting). Finally, the dissent contends that the trial court's assessment provides support for the nexus, or causation requirement, between appellant's mental illness and his dangerousness to others.

As to what facts demonstrate causation, the dissent apparently reasons that anytime a mentally ill person responds to a provocation with exaggerated behavior and threats of violence, that response demonstrates the required casual connection. While a permissible inference could exist in this case to that effect, the dissent forgets that the state's burden is to prove by clear and convincing evidence that appellant is a danger to others *because of* his mental disorder. ORS 426.130. In this case, the inference drawn by the dissent is equaled or outweighed by the reasonable inference that appellant's conduct was caused by Donald and not by his mental illness. Both Donald and appellant described what occurred between them as a physical altercation in which Donald was the physical aggressor and in which appellant was the only injured person. No witnesses attributed appellant's reaction to Donald to delusions, hallucinations, voices speaking to him, or any other indicator of mental illness. In our view, the inference that the dissent draws from the evidence does not rise to the level of making it highly probable that appellant's conduct was caused by his mental illness as distinguished from other potential causes.

As to the dissent's assertion that the "two mental health experts * * * specifically found that, due to his mental disorder, appellant was a danger to others," 181 Or App at 245 (Deits, C. J., dissenting), the record does not support that claim. Investigator Thor's written report concluding that appellant is dangerous to others does not contain an explanation of any nexus between appellant's conduct and his

mental illness. It refers to intimidating statements, threats, nonstop talking, and menacing gestures, but it does not link that conduct to any specific manifestation of appellant's mental disorder. It also refers to appellant's history of hospitalizations, but it does not explain why the conflict with appellant's brother is similar or dissimilar to what led to those hospitalizations. Finally, Thor comments in his report that "[appellant] has little insight into the factual actions that happened, other than, for the most part, it was entirely his brother[']s fault." If anything, that statement supports the understanding that appellant's conduct was caused by Donald and not by his mental illness.

Thor testified at the hearing and was asked, "Do you have an opinion as to what caused this particular incident?" Thor responded,

> "[f]rom my understanding of [appellant]'s history and from my experience of him in the hospital, and also the fact that he acknowledged on the interview of the 4th that he'd probably taken medication three times the previous week and a half, that *it was because he wasn't taking his medication.*" (Emphasis added.)

Moreover, Thor also testified that "[appellant's conduct] didn't indicate to me that he was a danger to himself so much as that he was mentally ill." It is reasonable to infer that Thor thought that appellant should be hospitalized because, as Thor said in his report, "appellant has never been completely consistent with following through on treatment and thus continues to suffer from the symptoms of mental illness." Whether appellant should receive more treatment for his mental illness is a different issue from whether he should be involuntarily committed because his mental illness causes him to be a danger to himself or others. When Thor's report and testimony are considered together, Thor's opinion never addresses the import of Donald's provocative and assaultive conduct.

Examiner Brown's testimony and her written report suffer from the same defect. They fail to draw any nexus between appellant's mental illness and his conduct. In her written report, Brown reports that appellant said, "This was just a normal brother to brother fight, and that his family

overreacted." Brown found that appellant "was fully oriented." When asked to explain in a written form how appellant's mental disorder was connected to and resulted in appellant's behavior described in question number four,[1] Brown wrote, "[his] thinking is disorganized and delusional." Brown did not explain in her report or in her testimony how disorganized and delusional thinking caused appellant to react to his brother in a way that was dangerous to himself or others. Both Thor and Brown checked the box on their written report forms that stated, "In my opinion, this person, because of the above stated mental disorder, is dangerous to others." The problem with relying on their acts of checking the boxes on the forms is that the underlying facts contained in their reports do not "explain how the mental disorder is connected to and resulted in" the behaviors described, as the forms expressly direct. Neither evaluation appears to have appreciated the distinction between the symptoms of mental illness and the legal requirement imposed by statute that a mental illness must be the *cause* of a person's dangerousness to himself or others before an involuntary commitment can lawfully be ordered.

Finally, the dissent argues that we should defer to the trial court's finding of a nexus. In light of our *de novo* review, any deference to the trial court is necessarily limited to its assessment of the credibility of witnesses, and this case does not turn on the credibility of witnesses. What is at issue is whether the state's evidence satisfies a legal requirement for involuntary commitment by clear and convincing evidence. As pointed out above, the court did not expressly find the required nexus. It appears to have jumped from the finding of mental illness to a finding of dangerousness to others, without regard for the need of the state to establish causation. On *de novo* review, we have analyzed the evidence in light of that legal requirement. We conclude based on the record before us that the state has not satisfied its burden by clear and convincing evidence in that regard.

Reversed.

---

[1] In response to question number four, Brown wrote that the behavior that made appellant dangerous to others was that he "refuse[d] to take medication, threaten[ed] family members with physical harm."

**DEITS, C. J.,** dissenting.

The majority reverses the trial court's decision to commit appellant to the custody of the Mental Health and Developmental Disability Services Division because it determines that there was not clear and convincing evidence to support a finding that appellant's mental disorder *caused* him to be a danger to himself or others. Because I believe there is clear and convincing evidence that appellant had a mental disorder at the time of the hearing and that his mental disorder caused him to be a danger to others, I dissent.[1]

The majority concludes that there is "[l]ittle in this record to show that appellant's actions or reactions toward Donald were caused by, or linked to, his mental illness. Rather, they could as reasonably be the result of his brother's instigation of the fight at the house or appellant's consumption of alcohol." 181 Or App at 236. Essentially, the majority characterizes what occurred as an unfortunate spat between two brothers. I disagree. Contrary to the majority's assessments, there is a great deal in this case to support the conclusion that there is a link between appellant's behavior and his mental illness. The evidence of the events leading to this commitment proceeding and the evaluation of the circumstances by appellant's family, the mental health examiners, and the trial court support the conclusion that appellant's behavior *resulted from* his mental disorder and that this behavior posed a danger to others.

As the majority explains, the incident on which this proceeding is based took place at a family picnic and began when appellant's older brother, Donald, who was visiting the family, asked whether appellant was taking his medication. As Donald explained:

> "I was sitting there with my wife and [appellant] approached. [Appellant] struck up a conversation and we started talking. I said bro, how you doing? I go have you been taking your meds? I go is everything okay? That was

---

[1] The trial court also found that there was clear and convincing evidence that appellant was a danger to himself. Because I would hold that it was proved by clear and convincing evidence that appellant was a danger to others, and that alone provides a basis for commitment, I do not address that alternative ground.

the sparking point of this whole incident; brother, have you been taking your meds, are you okay."

Appellant apparently was embarrassed by the question and reacted by swearing at his brother and also at his mother and father who were there and who tried to calm him. Following this exchange, appellant began to goad Donald into a fight. Donald started to respond to appellant but was asked by their father to back off. Donald did so and, in fact, told appellant that he was sorry and that he loved him. There apparently were a number of children in the area, including Donald's young children.

After the incident, the family left the area where it had been having its picnic. Appellant rode home with his mother and father. Although they continued to try to calm him, he remained extremely agitated, saying that he could chop his brother in the throat and that he would get a knife and stab him. His father described appellant as "manic in a wild way." The father said that appellant kept repeating things, such as "I can cut him. I can cut him. * * * I can chop him." Once they arrived at the house where appellant was also staying, appellant went to his room. Donald dropped off at least some family members at another location and returned to the house where appellant was. He explained that he did not think that his family could continue to stay there with this kind of friction. When he arrived at the house, he went to appellant's room. According to Donald, he asked appellant if they could talk. Donald said that they really needed to talk. Donald said that appellant's behavior scared him and that he had heard that he had hit the father. According to Donald, appellant responded by saying, "[F]uck your dad. I'[ve] knocked the mother fucker out and I'll do it again." Appellant repeatedly asked Donald to leave and, when he did not, appellant attempted to push Donald out of the room. The physical altercation between the brothers followed that interaction. During the altercation, appellant told his brother that he hoped Donald would get stabbed or shot.

There are also assessments by a mental health investigator and a mental health examiner who evaluated appellant after the incident and prior to the August 9 hearing. The written reports of both mental health experts

include a finding that appellant has a mental disorder, that he is a danger to others, and that appellant is dangerous to others because of his mental disorder. The mental health investigator, Thor, had worked with appellant for more than four years. He explained that appellant was originally diagnosed as having a bipolar disorder but that he has "Schizoaffective Disorder where there is an uninterrupted period of illness during which, at some time, there is a Manic episode with symptoms of Schizophrenia (delusions, hallucinations, disorganized speech)." He said that appellant was "inconsistent" in taking his medications.

At the time that Thor interviewed appellant on August 3, Thor described appellant's mood as "elevated, expansive and irritable" whenever doubts were raised about his story regarding the events of August 2. According to Thor, appellant's "mental illness was interfering with his ability to stay on task, to not be overly expansive." Thor said that he left on August 3, because it was difficult to keep appellant focused on his questions. Thor said that he decided to return the next day, because appellant would have his medications back in his system and would be able to concentrate better. When Thor returned the next day, appellant's symptoms were still there, but he had enough control that it was easier for Thor to direct appellant to his questions. However, Thor said that, even on August 4, appellant was acting in an agitated manner. He described appellant's behavior:

> "Each time he explained his version of the incident at home, [appellant] got very expansive and physically demonstrable *throwing himself into [a] choke hold and up against the wall or swinging and punching* the air to accent his anger about the 'things that were done to me and I get committed as a luny.' " (Emphasis added.)

Thor concluded in his report that appellant had a mental disorder and that he was not willing, able, or likely to participate in treatment on a voluntary basis. On the report that he submitted to the court, Thor also checked the box that corresponded to the following statement: "In my opinion, this person, *because of the above stated mental disorder*, is dangerous to others." (Emphasis added.) In that section of the report, he explained:

"[Appellant's] history of hospitalizations on Commitments have been either for danger to self or danger toward others. In this case, he was talking uncontrollably from the time the family left their house until upon return there from a picnic at Lake Selmac. He was making vile, provocative, intimidating statements and threats nonstop. He made statements threatening his brother's life in the car on the return from the lake and menacing gestures which made the parents stop the car to have him leave it. [Appellant] refused. He admits that he pushed his brother at the parents['] home after previously making statements about wanting to harm him according to the parents. This [led] to a physical altercation in which both [appellant] and the brother admit he was restrained (different viewpoints). He has little insight into the factual actions that happened other than, for the most part, it was entirely his brother[']s fault. His mother and father are very afraid of him and afraid of what he might do to them or their adopted son if he is not placed with JCMHP by the Court."[2] (Emphasis added.)

At the hearing, when asked for his opinion of the cause of the incident, Thor testified:

"From my understanding of [appellant's] history and from my experience of him in the hospital, and also the fact that he acknowledged on the interview of the 4th that he'd probably taken medication three times the previous week and a half, that it was because he wasn't taking his medication."

The mental health examiner, Cheryl Brown, who interviewed appellant the day before the hearing reached a similar conclusion. She testified that, during her interview with appellant, he was "grandiose in his thinking, and acknowledged feelings of depersonalization, and in my judgment had very poor insight into his mental illness and considerable denial regarding the events that had occurred." Brown's report included the following findings:

"3.  In my opinion, the above-named person suffers from a mental disorder.
        "Yes  X_  No  (if No, do not answer 4, 5, 6, 7)
        "a)  State diagnostic impression schizoaffective disorder, bipolar type

---

[2] In Thor's report, he states that appellant's parents adopted appellant's son.

"b)   Describe how disorder manifests in person's thoughts/behavior
"Delusional, manic, stops taking medication, threatening harm to family members, bizarre behavior

"4.   In my opinion, the above-named person, due to a mental disorder, is:

"Dangerous to others                     Yes X No__
"Dangerous to self                       Yes__ No__
"Unable to provide for                   Yes X No__
basic needs

"a)   describe the behavior that makes the person dangerous to self/others, or unable to care for basic needs [Appellant] refuses to take medication, threatens family members with physical harm * * *. In my opinion, the above-named person's mental disorder results in behavior(s) that make(s) the person a danger to self/others, unable to care for basic needs
Yes X       No__
"b)   explain how the mental disorder is connected to and results in the behavior(s) described in #4 [His] thinking is disorganized and delusional[.]"

The record of the commitment proceeding also shows that appellant's symptoms, in particular his inability to control his behavior, continued at the hearing on August 9. Throughout the hearing, he continually engaged in verbal outbursts, despite being repeatedly told not to do so and that he would get a chance to talk.[3]

The majority is correct that there needs to be a "causal nexus between the mental disorder and at least one of the ORS 426.005(1)(d) criteria." *State v. Gjerde*, 147 Or App 187, 192, 935 P2d 1224 (1997). This case, however, is very different from *Gjerde*. In *Gjerde*, the appellant refused placement in a nursing home and there were concerns that she might not be able to obtain necessary emergency medical

---

[3] For example, at one point during the hearing, appellant's father stated that "[e]verything [appellant] said was repeated three to four times in a row, over and over and over. I can cut him. I can cut him. * * * I can chop him." Thereafter the following took place:

"[Appellant]:  I didn't say that. (Inaudible) we are.

"[Appellant's Attorney]:  (Inaudible) wait (inaudible)

"[Appellant]:  I'll chop him. I'll chop him. (Inaudible)"

treatment if she remained at home. The appellant explained that the reason for her resistance to being moved to a nursing home was her distrust of the medical community in general and her belief that she could take care of herself at home. We concluded:

> "Appellant's testimony evinces a free, knowing, and rational choice to return home, notwithstanding the attendant risks. It is not necessarily the choice that everyone would make. But it is appellant's choice. * * * Unless a mental disorder has impaired autonomous choice, civil commitment cannot be a vehicle for 'saving people from themselves.' " *Id.* at 196.

As noted above, in *Gjerde*, we reversed the commitment because we did not believe that the appellant's decision was a result of her mental disorder.

This is a very different case. Here, the evidence is clear and convincing that appellant's behavior resulted from his mental disorder. In this case, not only does the evidence of what occurred demonstrate the necessary relationship, but significantly, as noted above, the two mental health experts who evaluated appellant, one of whom had known appellant for some time, specifically found that, due to his mental disorder, appellant was a danger to others.

Finally, the conclusion that appellant's behavior resulted from his mental disorder is also supported by the assessment of the trial court judge who, significantly, had the opportunity to hear and review the evidence presented and to personally evaluate appellant's behavior. As we have recognized on numerous prior occasions, although our review in mental commitment cases is *de novo*, the trial court's findings in this type of case are due some deference. As we have explained: "We cannot ignore the fact that, in a mental illness case, the circuit court's opportunity to view appellant's demeanor may be critical in reaching a conclusion as to his mental state." *State v. Smith*, 71 Or App 205, 212 n 8, 692 P2d 120 (1984); *see also State v. Jacobson*, 142 Or App 371, 922 P2d 670 (1996) (trial court's findings deserve some deference because the court had an opportunity to observe the appellant's demeanor); *State v. Furnish*, 86 Or App 194, 738

P2d 607 (1987) (same). Based on all of the above considerations, I agree with the trial court that appellant had a mental disorder at the time of the hearing and was dangerous to others because of his mental disorder.

According to the majority, however, my analysis is incorrect because neither the evidence of what occurred, *nor* the opinions of the mental health experts, *nor* the evidence of appellant's behavior in the courtroom, *nor* the trial court's assessment of appellant's behavior provides clear and convincing evidence of the necessary causal connection. In reaching my conclusion, however, I do not take the position that each factor would be sufficient by itself to establish the causal connection in this case. Rather, in my view, considering together all of the above factors, there is clear and convincing evidence of the necessary causal connection. With that in mind, I turn to the majority's specific arguments concerning each factor.

With regard to appellant's conduct and the opinions of the mental health experts, the majority states that "[n]o witnesses attributed appellant's reaction to Donald to delusions, hallucinations, voices speaking to him, or any other indicator of mental illness," 181 Or App at 237, and that "[t]he problem with relying on [the experts'] acts of checking the boxes on the forms is that the underlying facts contained in their reports do not 'explain how the mental disorder is connected to and resulted in' the behaviors described, as the forms expressly direct," 181 Or App at 239. My view of the record, however, is different.

In her report, Brown indicated that appellant has a mental disorder; that delusions, the failure to take medication, and threats of physical harm to family members are manifestations of the disorder in appellant's behavior and thoughts; that appellant is dangerous to others due to that mental disorder; that the behavior that makes him dangerous to others includes his refusal to take medication and his threats to family members; and that appellant's "disorganized and delusional" thinking explains the manner in which the mental disorder results in the behavior that makes appellant a danger to others. Brown's statements clearly provide

evidence that the appellant was a danger to others due to his mental disorder.

In his report, Thor also opined that appellant was dangerous to others because of his mental disorder. According to Thor, on August 2, appellant (1) "was making vile, provocative, intimidating statements and threats nonstop," (2) "made statements threatening his brother's life in the car on the return from the lake and menacing gestures which made the parents stop the car to have him leave it," and (3) "admits that he pushed his brother at the parents['] home after previously making statements about wanting to harm him according to the parents." At the hearing, Thor testified that the incident was caused by appellant's failure to take his medication properly. Thor also indicated that the medication helped to control appellant's mental disorder. When viewed in context, Thor's statements indicate that the behavior demonstrating that appellant was dangerous to others was caused by appellant's failure to take the medication that helped to control his mental disorder. In other words, appellant is dangerous to others because of his mental disorder.[4]

With regard to the trial court's finding concerning the causal relationship, the majority begins by noting that "the court did not expressly find the required nexus," 181 Or App at 239. Although the trial court may not have expressly stated that the causal connection exists, we have *de novo* review, and I, unlike the majority, conclude that there is clear and convincing evidence of such a connection. The majority also asserts that, "[i]n light of our *de novo* review, any deference to the trial court is necessarily limited to its assessment of the credibility of witnesses, and this case does not turn on the credibility of witnesses." 181 Or App at 239. The majority's view of the deference afforded the trial court

---

[4] The majority states that, "[w]hen Thor's report and testimony are considered together, Thor's opinion never addresses the import of Donald's provocative and assaultive conduct." 181 Or App at 238. Thor's report indicates, however, that he was aware of appellant's assertions that (1) he had been provoked by Donald, (2) there was a physical altercation in which appellant had been punched, and (3) the incident was his brother's fault. Nevertheless, Thor opined that appellant is dangerous to others because of his mental disorder. In any event, Thor assessed appellant, not Donald.

in this type of case, however, is too narrow and does not comport with our case law. In *Furnish*, we stated:

"Although we review *de novo*, 'we cannot ignore the fact that, in a mental illness case, the circuit court's opportunity to view appellant's demeanor may be critical in reaching a conclusion as to his mental state. Therefore, we do give some deference to the conclusion of the circuit court.' *State v. Smith, supra*, 71 Or App at 212 n 8." 86 Or App at 198.

In sum, after reviewing the evidence of what occurred, the opinions of the mental health experts, the evidence of appellant's behavior in the courtroom, *and* the trial court's assessment of appellant's behavior, I would conclude that there is clear and convincing evidence that appellant is a danger to others due to his mental disorder. For all of the above reasons, I respectfully dissent.