Submitted on record and briefs June 4, reversed July 17, 2002

In the Matter of Jerry Rainbolt,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

JERRY RAINBOLT,
*Appellant.*

MI01-07-24; A115709

50 P3d 1228

Gay Canaday filed the brief for appellant.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

■ Appellant appeals a judgment adjudicating him to be a mentally ill person and committing him to the Mental Health Division. The trial court committed appellant because it found that he suffers from a mental illness and was unwilling or unable to participate in treatment on a voluntary basis. On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

In mid-May 2001, appellant started exhibiting a change in his behavior. He was sleeping less, pacing, losing weight, stressed, and generally uncooperative. In late May 2001, appellant was hospitalized at Good Samaritan Hospital on a notice of mental illness after driving his car into a tree and a brick building at 60 mph. He was diagnosed with depression and was prescribed antidepressant medication. He was cooperative with treatment and was discharged to follow up with Clackamas County Mental Health.

In mid-July 2001, appellant left his home in his car and, on his return six hours later, was unable to give any account of his whereabouts or actions. When he returned home he told his family that the police were hiding in the house and in the closets. Appellant again was sleeping only a few hours at night, resumed pacing, and ate very little. On the day before his admission to the hospital, appellant did not eat or drink anything. His family then brought appellant to the emergency room at Portland Adventist Hospital, stating that they were unable to care for him. He was again admitted for psychiatric treatment and was diagnosed with major depression with psychotic features. Appellant's wife reported that, after his discharge from Good Samaritan Hospital in June he seemed to be doing better but had been "worse than she has ever seen him" in the weeks leading up to his current commitment.

At the time of the hearing, appellant was 53 years old, had been married for 32 years, and had worked as a commercial painter for the same company for 27 years. He was off work for several weeks for his mental health problems, returned briefly in July, and then abruptly quit. He has three

adult children and four grandchildren. His family is very supportive, and he has a large extended family living near him. His wife attributed appellant's mental condition and change in character to family stress. Just before commitment, one of appellant's daughters and her husband were contemplating resigning from the family's church, which caused appellant considerable stress. At the hearing, they had not yet resigned from the church, but it was still a possibility that they would do so.

Appellant's religious beliefs provide that faith healing should be tried first and that doctors and medicine should be considered only if that fails. Appellant never had any medical treatment until his first psychiatric hospitalization in late May or early June 2001. After his first hospitalization, he had, however, been taking his prescribed medication and participating in outpatient treatment at Clackamas County Mental Health. Both appellant's wife and his son-in-law support appellant's taking of medications, although some of his siblings are opposed to it.

At his commitment hearing, appellant expressed his desire to return home to his family, where he has a strong support system. Appellant testified that he takes his medication and that it has helped him. Appellant also testified, however, that taking his medication is a "stressor" for him and that he hoped eventually to stop taking it. His family members, specifically his wife and son-in-law, testified that they also would like for him to return home and that they would assist him with his medication treatments and appointments. They also testified that, if appellant failed to follow through with outpatient treatment, they would seek advice from the hospital as they had done previously.

The mental health investigator testified that the plan of appellant receiving outpatient treatment is dependent on his family assisting him in meeting his basic needs. The investigator acknowledged that appellant's family "are all very supportive" and, with the assistance of his family, he could meet his basic needs. Furthermore, one of the two court-appointed examiners found that appellant "would cooperate with and benefit from a program of voluntary treatment." The other court-appointed examiner found otherwise.

The trial court's main concern for appellant focused on his involvement and his family's involvement with their church and religious beliefs:

"You have been involved, and all of you have been involved, in that church for your whole lives, and religious beliefs are part of us. And you are in the [throes] of a very strong conflict that involves modern medicine and psychiatric care.

"Taking drugs to help treat depression, the diagnosis of that you've been diagnosed with, and the beliefs of your church that you have clearly—as well as your family, clearly put at a very high level in your daily decisions, your very most important decisions, family decisions. The family unit is impacted by your religious beliefs, so much so, that you [made] a comment that if your son-in-law who would be the person that would be monitoring your care were to make a decision to leave the church that that would have an impact on whether he could continue as your caregiver.[1] I'm very distressed by that. And I think that's an honest answer, and I think it's very real.

"Now, I believe that these are problems, I think, that are going to take some time to sort out, and I don't think you can do that on your own. And under other circumstances, I think your family members as committed members could help you, but I'm not convinced they can with the overlay of the beliefs that you have relative to your religious organization."

Based on that, the trial court found appellant to be a danger to himself and that his ability to participate in treatment on a voluntary basis was lacking even with the help of his family. The trial court therefore ordered appellant's commitment to the custody of the Mental Health Division for a period not to exceed 180 days.

■  On appeal, appellant argues that there is insufficient evidence to find that he suffers from a mental disorder and that he is unwilling or unable to participate in voluntary treatment. We hold, without further discussion, that appellant suffers from a mental disorder. However, under ORS

---

[1] When questioned about the prospect of his daughter and son-in-law leaving the church and what effect that would have on his treatment, appellant testified that his communication with them would be limited and that it would be difficult for his son-in-law to continue to oversee his treatment.

426.130,[2] release is mandated if the mentally ill person is willing and able to participate in treatment on a voluntary basis and the court is satisfied that that person will probably do so. *See State v. Doe,* 116 Or App 18, 21, 840 P2d 727 (1992). We hold that the trial court erred in concluding that appellant would be unwilling or unable to participate in voluntary treatment with the help of his family.

Appellant testified that he would be willing to participate in voluntary treatment and take his medications. His wife and his son-in-law also testified that they would be very willing to assist him with his outpatient treatment, which would include making sure that he takes his medication. *See, e.g., State v. Turel,* 182 Or App 235, 48 P3d 175 (2002) (appellant not subjected to basic needs commitment when he had been living at a care center where, with the assistance of others, all of his basic needs were cared for). There is no evidence that appellant ever refused to take his medication or refused to cooperate with his treatment. Although the family dynamics include some religious issues, there are no indications that the family's religious beliefs are obstacles to appellant's treatment and discharge plan. On the contrary, appellant's family sought help for appellant when they felt it was necessary that he receive psychiatric treatment. His wife and son-in-law also testified that they would do the same if, in the future, appellant's treatment became too much for them to handle.

One of the trial court's main concerns was whether appellant's son-in-law could continue as a caregiver *if* he and his wife left the church. However, "[a]pprehensions, speculations and conjecture are not sufficient to prove a need for

---

[2] ORS 426.130 provides, in part:

"(1) After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"* * * * *

"(b) Mentally ill based upon clear and convincing evidence, the court:

"(A) Shall order the release of the individual and dismiss the case if:

"(i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and

"(ii) The court finds that the person will probably do so."

mental commitment." *State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999). The court's speculation that the religious practices of the family interfered with his continued treatment is not supported by clear and convincing evidence in the record.

Although appellant suffers from a mental disorder, the record lacks clear and convincing evidence that appellant is unwilling or unable to cooperate with and benefit from voluntary treatment with the help of his family.

Reversed.