Argued and submitted January 20, affirmed October 26, 2005,
petition for review denied March 21, 2006 (340 Or 308)

In the Matter of Dallas Lott,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

DALLAS LOTT,
*Appellant.*

30-03-18791; A122880

122 P3d 97

James A. Palmer filed the brief for appellant.

Judy Carol Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Schuman, Judge.*

BREWER, C. J.

Edmonds, P. J., dissenting.

---

\* Schuman, J., *vice* Ceniceros, S. J.

## BREWER, C. J.

The trial court committed appellant to the custody of the Mental Health Division after finding that, because of a mental disorder, she was dangerous to others. ORS 426.005(1)(d)(A). Appellant argues that the state did not carry its burden for involuntary commitment. On *de novo* review, *State v. Miller*, 198 Or App 153, 155, 107 P3d 683 (2005), we affirm.

■  We review the facts as they existed on the date of the commitment hearing. *Id.* The state sought to commit appellant after she fired a gun into the wall that divided her apartment from that of her neighbors. At the commitment hearing, two mental health professionals testified that appellant suffered from a mental disorder and, as a result, posed a danger to others.

The first, Dr. Walker, a psychiatrist, diagnosed appellant as suffering from a "psychotic disorder not otherwise specified." She testified that appellant's mental disorder caused appellant to have "paranoid concerns, fears, [and] ideas" or "paranoid ideation" and eventually led appellant to fire the gun into the apartment wall. Walker expressed concern that appellant "continue[d] to lack the insight into the implications of discharging a weapon in the community." That concern about appellant's continued lack of insight appears to have formed the basis for Walker's opinion that appellant posed a danger to others. Walker also testified that appellant had improved since discharging the gun and being hospitalized. She opined that, if appellant were to continue to take her medication and undergo outpatient therapy, she could be returned to "a previous level of functioning where she would no longer pose a danger to others." In Walker's opinion, however, appellant had not yet reached that level. Walker stated that, although appellant had improved and had less paranoid ideation, appellant nonetheless remained a danger to others. Walker also opined that appellant should not be released from the hospital without "clarification of her outpatient plan." Walker recommended a structured treatment program that would be monitored by Department of Human Services (DHS).

Another medical professional to testify was Ivan Sumner, a certified mental health investigator. He, too, testified that appellant suffered from a mental disorder that caused her to be suspicious of others, which led to the incident with the gun. Sumner shared Walker's concern that appellant lacked insight into why she fired the gun and into the danger of doing so. He further testified that, during both the precommitment investigation and his interview with appellant on the morning of the hearing, appellant claimed that she did not remember firing the gun. Sumner also agreed with Walker that appellant "still carries the basic suspicious and paranoid feelings about the next door neighbors" that led her to fire the gun into the wall of her apartment.

Sumner also described the likely result of appellant being committed. He testified that, if appellant were committed, she would probably be required to undergo treatment on an outpatient basis and might be able to undergo that treatment in Texas, where her mother and other family members resided.[1] Sumner's report, which the court admitted into evidence for its relevance for diagnostic purposes, included medical records from appellant's involuntary prehearing period of detention. Among those records was an involuntary hold form stating that appellant told a mental health worker during her detention that the Veterans Administration previously had advised her to consult with a psychiatrist but she had not done so.[2]

Jessica Danford, a registered nurse, testified that appellant had taken her medication while in the hospital but

[1] *See State v. Hilliard*, 195 Or App 538, 543, 98 P3d 767 (2004), *rev den*, 338 Or 16 (2005) (holding that commitment does not require a person to be placed in a hospital or approved inpatient facility and that DHS may instead place a committed person in outpatient treatment under ORS 426.127).

[2] Sumner was required to include that "pertinent part of the medical record" in his precommitment investigation report. ORS 426.074(2)(c). The record was admissible on at least two bases. First, it was admissible without qualification as a medical record for the current involuntary prehearing period of detention. ORS 426.095(4)(a). Second, it also was admissible under OEC 803(4) as part of the report that was reasonably pertinent to appellant's diagnosis or treatment. ORS 426.095(4)(d)(B); *see also State v. O'Neill*, 274 Or 59, 71, 545 P2d 97 (1976) (preevidence code decision upholding admission in evidence of medical records consisting primarily of statements made by appellant during prehearing detention that were admitted for diagnostic purposes).

that she was noncompliant with hospital privilege rules and had been manipulative.

Appellant also testified at the hearing. Although she did not expressly acknowledge that she had fired a gun, she did attempt to justify such an action:

"And my intention wasn't to point a gun at either one of [her neighbors], it's just that evening someone threw something at my door. It sounded like a rock. Okay? But I didn't even open my door for that. And then again that evening— this is all happening in one day. And then that evening, I heard somebody knock at my door. And I went to the door, and I looked through the peephole, and I asked: Who is it? They would not respond.

"But this description that I gave dispatch, and I did call 911, matches the description of the gentleman who lives next door to me: Dark-haired male, slender build, about 150, 160 pounds. That's not my imagination, that's exactly how my neighbor looks. Okay? So I did all the right things.

"And I'm a single woman living by myself. Are you trying to tell me I do not have the right to protect myself?"

Appellant also stated, "But I am not at all opposed to having therapy. A couple of times a week I feel I need to get some of these issues resolved and off my mind." In addition, appellant testified that she would move to Texas to be near her mother and other family members who could help her obtain therapy.

Appellant's mother also testified about appellant's prospect of obtaining treatment. She said that appellant could return to Texas and live with her until she could locate a home for appellant. She further testified that appellant has the financial resources to afford private treatment and told the court that she would help appellant obtain treatment.

In addition to testimony, the trial court considered the report of the mental health examiner whom the court appointed to evaluate appellant. In his report, the examiner concluded that, because appellant had improved since the incident with the gun and no longer had access to the gun, she no longer posed a danger to others. The examiner stated that he was not convinced that appellant was earnest in her

assertion that she would participate in treatment, but that "she seemed to be trying to cooperate." At the hearing, the trial court asked the examiner whether he believed that appellant was subject to commitment. The examiner replied:

> "Well, with the caveats we discussed, assuming that she follows through with those. I'm kind of swayed, you know, either way. I mean, if she was refusing, I would say she would be subject to commitment. It's that issue of whether she's voluntary or not."

In his report, the examiner made the following recommendations:

> "Continued brief inpatient treatment with outpatient treatment and counseling. Evaluate the role her mother plays in her life. Try to motivate her to make friends and have a social life and meaningful activities."

After considering the evidence, the trial court found that appellant suffered from a mental disorder and that, as a result of that disorder, she was dangerous to others. The court also found that appellant "is able to take care of herself but she is not receiving such care as is necessary without our intervention." The court committed appellant to the custody of DHS. Finally, the court added:

> "Now, that doesn't mean that [DHS] cannot facilitate her move to Texas if that's what you think's appropriate. I have now put the case in your hands and what you do with it is up to you. But this does maintain at least some hold over her to ensure that she follows through with what they're planning.
>
> "And if that means communicating with the mental health people in Texas to aid in monitoring that's—I have no position on that whatsoever."

On appeal, appellant does not challenge the determination that she has a mental disorder. Instead, she argues that the state did not produce clear and convincing evidence that she is dangerous to others and that she will not participate in treatment on a voluntary basis. We address each of her arguments in turn.

■ The state had the burden to prove by clear and convincing evidence that appellant was either a danger to herself or others or was unable to care for her basic needs and was not receiving such care. *See* ORS 426.005 (defining mentally ill person); ORS 426.130(1)(b) (stating the clear and convincing evidence standard for a court's determination of mental illness). In determining whether a person poses a danger to others, it is appropriate for a court to consider the testimony of mental health experts, the person's past acts, and the person's apparent condition at the time of the hearing. *Miller*, 198 Or App at 158; *State v. Furnish*, 86 Or App 194, 197, 738 P2d 607 (1987).

■ Appellant asserts that, because the state relied on her past act—firing a gun into her neighbors' wall—to establish that she was dangerous, the evidence in this case resembles the evidence we found insufficient in *State v. Lucas*, 31 Or App 947, 571 P2d 1275 (1977). In *Lucas*, we held that, if the state relies on a past violent act to establish that a person remains a danger to himself or others at the time of the hearing, the state must show that the act "clearly forms the foundation for a prediction of future dangerousness[.]" *Id.* at 950. In that case, the state argued that the appellant posed a danger to himself because he had attempted suicide. However, the appellant's physicians did not testify that the appellant's suicidal behavior was likely to be repeated, and there was no other testimony that attempted to predict the appellant's future conduct. As a result, we held that the state had failed to prove that the appellant's attempted suicide formed the foundation for a prediction of future dangerousness and, therefore, had failed to meet its burden to prove that element. *Id.* at 951.

We agree with appellant that, as in *Lucas*, the state relied on appellant's past conduct to demonstrate future dangerousness. In contrast to *Lucas*, however, here the state showed that appellant's act of firing the gun "clearly forms the foundation for a prediction of future dangerousness." Two mental health experts testified that appellant still harbored the paranoid fears that led her to fire the gun. Both testified that she lacked insight into the dangerous nature of her conduct. Because the paranoid fears that led appellant to commit a violent act remained present, both experts were able to

predict that appellant would again become violent. As a result, both opined that appellant remained a danger to others.

Appellant's condition at the time of the hearing reinforces that conclusion. She stated that her conduct was justified because someone threw what sounded like a rock at her door and, later, someone knocked at her door. She maintained that she had done "all the right things" and that she had "the right to protect herself." Appellant's testimony confirms that she lacked insight into the danger of firing a gun at the wall of a neighboring apartment.

In sum, the testimony of mental health experts, appellant's past violent act, and appellant's condition at the time of the hearing combined to constitute clear and convincing evidence that appellant was a danger to others at the time of the hearing.

We turn to appellant's argument that the state failed to produce clear and convincing evidence that she will not participate in treatment on a voluntary basis. If a mentally ill person is willing and able to participate in treatment on a voluntary basis, and the trial court finds that the person "will probably do so," the court must release the person and dismiss the case. ORS 426.130(1)(b)(A).[3] The statute thus includes two separate requirements for release and outright dismissal of the case: "[F]irst, the 'mentally ill person' must be willing and able to participate in treatment on a voluntary basis; second, the court must be satisfied that the person *will probably* participate in voluntary treatment." *State v. Doe*, 116 Or App 18, 21, 840 P2d 727 (1992) (emphasis in original). In this case, we need not detain ourselves with the issue

---

[3] ORS 426.130 provides, in part:

"(1) After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"* * * * *

"(b) Mentally ill based upon clear and convincing evidence, the court:

"(A) Shall order the release of the individual and dismiss the case if:

"(i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and

"(ii) The court finds that the person will probably do so."

whether appellant actually was willing and able to participate in treatment on a voluntary basis because, in any event, the evidence did not show that she probably would do so. Accordingly, we limit our focus to the latter issue.

■■ The determination whether a mentally ill person probably will participate in treatment on a voluntary basis is a dispositional one, to be made only after the court has determined by clear and convincing evidence that the person is mentally ill. *State v. Brenhuber*, 146 Or App 719, 722, 934 P2d 550 (1997). Contrary to appellant's premise, in determining whether that requirement has been satisfied, the court applies a preponderance of the evidence standard of proof, not a clear and convincing evidence standard. *State v. Rainbolt*, 184 Or App 661, 57 P3d 902 (2002). We note that, in *Rainbolt*, we appear to have assumed that the state has the burden of proof as to whether a person found to be mentally ill is or is not "willing and able to participate in treatment on a voluntary basis." *Id.* at 662. We do not find it necessary to consider, in the present case, whether we were correct in so allocating the burden of proof in *Rainbolt* because, regardless of which party had the burden of proof on the matter, a preponderance of the evidence in this record supports the trial court's conclusion.

In this case, the trial court did not find that appellant probably would participate in treatment on a voluntary basis, despite her testimony that she was "not at all opposed to therapy." To the contrary, the court found that appellant "is able to take care of herself but she is not receiving such care as is necessary without our intervention." After making that finding, the court stated that commitment "maintain[s] at least some hold over [appellant] to ensure that she follows through with what they're planning," implicitly determining that appellant probably would not voluntarily participate in treatment if the case were dismissed outright.

We agree with that determination. Appellant's testimony that she had done "all the right things" in connection with the gun incident showed a lack of insight that detracted from the probability that she would take seriously her need for treatment and follow through with it. Further, the examiner apparently was undecided whether appellant would

obtain proper treatment; he recommended that appellant receive "continued brief inpatient treatment with outpatient treatment and counseling." In addition, Walker recommended a structured treatment program that would be monitored by DHS. Appellant herself testified rather vaguely that she would not be opposed to therapy "a couple of times" per week to "get some of these issues resolved." However, that testimony goes primarily to appellant's willingness to participate in therapy, as provided in ORS 426.130(1)(b)(A)(i), not to the probability that she would do so, as provided in ORS 426.130(1)(b)(A)(ii). In any event, at the time of hearing, no specific plan had been developed to ensure that any treatment appellant might consider would adequately address her mental disorder. Moreover, appellant's limited offer to participate in therapy must be viewed in the context of her previous failure to follow through with psychiatric treatment recommended by the Veterans Administration. Danford also testified that, while in prehearing detention, appellant had been noncompliant with hospital rules and manipulative.

Even though appellant's mother testified that she would help appellant seek treatment in Texas, appellant's relocation from Oregon and the concomitant dismissal of the case would place appellant beyond the scrutiny of mental health authorities. In that regard, we note that appellant's mother could have sought appellant's conditional release to her care in Texas under ORS 426.125.[4] However, appellant's

---

[4] ORS 426.125 provides:

"The following qualifications, requirements and other provisions relating to a conditional release under ORS 426.130 apply as described:

"(1) A court may only order conditional release if all of the following occur:

"(a) The conditional release is requested by the legal guardian, relative or friend of the mentally ill person.

"(b) The person requesting the conditional release requests to be allowed to care for the mentally ill person during the period of commitment in a place satisfactory to the judge.

"(c) The person requesting the release establishes all of the following to the satisfaction of the court:

"(A) Ability to care for the mentally ill person.

"(B) That there are adequate financial resources available for the care of the mentally ill person.

"(2) If the court determines to allow conditional release, the court shall order that the mentally ill person be conditionally released and placed in the

mother made no such request. Appellant wanted only outright dismissal, a disposition that would remove her from any of the safeguards associated with conditional release or any other form of supervision.

It is understandable, on this record, that the trial court decided not to dismiss the case but, rather, kept the case open so that appellant's treatment could be supervised if she did, in fact, move to Texas. Because the trial court had the opportunity to observe appellant's demeanor in weighing that decision, we should accord it an additional measure of respect in conducting our *de novo* review. *State v. Webber*, 181 Or App 229, 239, 45 P3d 1046 (2002). With due regard for the entire record, and despite appellant's testimony regarding her willingness to participate in some sort of therapy, the evidence did not establish that she probably would do so on a voluntary basis. *See Doe*, 116 Or App at 18 (despite appellant's testimony that she would participate in treatment on a voluntary basis, court did not find that she was likely to do so).

We turn finally to the dissent. We agree with many of the philosophical sentiments that it expresses. In fact, our disagreement, when reduced to its core, is quite narrow. The dissent does not actually dispute our conclusions that clear and convincing evidence established that appellant had a mental disorder and was a danger to others at the time of the hearing. We disagree solely on the issue whether the evidence established that appellant probably would participate in treatment on a voluntary basis, notwithstanding her expressed willingness to do so.

Although courts must vigorously safeguard the constitutional and statutory rights of the mentally ill to be free from overzealous government interference, that duty does not require us to order the dismissal of this case. Here, for the reasons discussed, the trial court had every reason to believe that such a disposition, in conjunction with an unsupervised out-of-state move, would undermine the probability that

---

care of the requester. The court shall establish any terms and conditions on the conditional release that the court determines appropriate.

"(3) Any conditional release ordered under this section is subject to the provisions under ORS 426.275."

appellant would follow through with treatment. On *de novo* review, we agree with that assessment.

Affirmed.

**EDMONDS, P. J.,** dissenting.

This case is about the sufficiency of the evidence required to deprive a person with a mental disorder of her liberty. The trial court committed appellant to the Mental Health Division for a period not to exceed 180 days even though all concerned, except for the trial judge, believed that she was willing to obtain treatment for her disorder on an outpatient basis. Nonetheless, the majority affirms the trial court's decision on *de novo* review. I dissent because the majority's reasoning is not supported by the evidentiary record.[1]

The legislature established a framework in ORS 426.130(1) to prevent what occurred in the trial court in this case. It provides, in part:

"After hearing all of the evidence, and reviewing the findings of the examining persons, the court shall determine whether the person is mentally ill. If, in the opinion of the court, the person is:

"(a)  Not mentally ill, the person shall be discharged forthwith.

"(b)  Mentally ill based upon clear and convincing evidence, the court:

"(A)  Shall order the release of the individual and dismiss the case if:

"(i)  The mentally ill person is willing and able to participate in treatment on a voluntary basis; and

"(ii)  The court finds that the person will probably do so."

The words used in ORS 426.130(1) are words of legal art and have specific definitions. "Mentally ill" means "a person who, because of a mental disorder" is "[d]angerous to self

---

[1] The applicable law in this case, ORS chapter 426, provides safeguards so that mentally ill persons will not be deprived of their liberty because of their disorder except in circumstances where no other option for treatment is available.

or others[,]" is "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health or safety[,]" or is "chronically mentally ill" as defined by statute. ORS 426.005(1)(d). "Clear and convincing evidence" requires that the truth of the facts asserted in support of the involuntary commitment be "highly probable." *State v. Waites*, 71 Or App 366, 369, 692 P2d 654 (1984). The word "probably" in ORS 426.130(1)(b)(A)(ii) means "more likely than not." *See, e.g., State v. Maxfield*, 133 Or App 371, 374, 891 P2d 1342 (1995) (construing the word "probably" in the context of a search warrant affidavit).

In light of the above definitions, it is important to distinguish what is and what is not at issue in this case. Appellant concedes that she suffers from a mental disorder. The state argues only that she was dangerous to others by reason of her mental disorder at the time of the commitment hearing; it does not contend that she is dangerous to herself or that she is unable to provide for her basic personal needs. Therefore, the state must prove by clear and convincing evidence, (*i.e*, that it was highly probable) that appellant was a danger to others at the time of the hearing. For purposes of this opinion, I will assume that the state has carried that burden. Left in issue is the appropriate disposition under ORS 426.130(1) and, in particular, whether appellant was entitled to release under sub-subparagraphs (1)(b)(A)(i) and (ii) of the statute. The trial court found that appellant was "able to take care of herself." I agree with that finding. The trial court did not make an express finding about appellant's willingness to seek outpatient treatment, but appellant told the court and others that she agreed that outpatient therapy was appropriate. The remaining issue on appeal is whether, under ORS 426.130(1)(b)(A)(ii), appellant probably would have sought voluntary treatment if given that opportunity. Under that statute, the court must find by a preponderance of the evidence (*i.e.*, that it is more likely than not) that appellant probably would not seek outpatient treatment.

Though the issue under ORS 426.130(1)(b)(A)(ii) was squarely presented to the trial court, it never determined whether appellant probably would participate in voluntary treatment. The majority, however, presumes such a determination based on the trial court's statements that appellant

"is able to take care of herself but she is not receiving such care as is necessary without our intervention" and that the commitment "maintain[s] at least some hold over [appellant] to ensure that she follows through with what they're planning." 202 Or App at 337. There are two fundamental problems with the majority's presumption. First, if the trial court meant to say that appellant probably would not seek voluntary treatment *in the future*, that is not what it said. The trial court addressed whether appellant was presently receiving the necessary treatment—a different inquiry than is required under ORS 426.130(1)(b)(A)(ii). Second, and more important, even assuming that the trial court impliedly did not find that appellant probably would participate in voluntary treatment in the future, that conclusion is contrary to the evidence in the record.

Four witnesses testified at the commitment hearing: (1) Dr. Lisa Walker, the staff psychiatrist at Sacred Heart Hospital in Eugene and appellant's treating physician; (2) Jessica Danford, a registered nurse, who helped to care for appellant; (3) Ivan Sumner, a mental health investigator for Lane County; and (4) Rose Lott, appellant's mother. In addition, appellant made an unsworn statement to the court. Also, a precommitment investigation report authored by Sumner was admitted into evidence for limited purposes. The trial court sustained appellant's objection to the report based on "hearsay content for use other than diagnostic purposes." However, the court observed that "the material will be able to be used by the examiner and the investigator for opinion testimony." Finally, the trial court received a report from Greg Sulliger, a certified mental health examiner.

Sulliger's report describes the background that led to the commitment hearing:

"This is the case of a 50 year old, divorced woman who discharged a firearm (handgun) in her apartment and the bullet hit the outside wall of the neighbors. She had called the police earlier to report a man prowling around her apartment. It was believed that she discharged her 38 caliber hand gun in her apartment but she denied it to the police and crisis people who interviewed her. After the shooting[,] an officer did come and after interviewing her[,] arrested her for discharging a firearm but took her to the hospital

where a hold was placed on her. At the emergency room[,] [appellant] was described as paranoid and psychotic. She was believed to be dangerous and a hold was placed on her."

On direct examination, Walker testified that, due to a psychotic disorder, appellant was a danger to others. Walker was asked, "Due to her condition, do you think she's adequately able to take care of herself outside this hospital setting?" Walker responded, "Yes." Walker was then asked if appellant needed further hospitalization, that is, "commitment." After seeking clarification from the court, she answered, "I think she needs to stay in treatment and take medicines." She added, "[I]f [appellant] stays on medication and gets some psychotherapy that she can be—return to her—a previous level of functioning where she would no longer pose a danger to others." Sulliger then inquired of Walker regarding whether appellant had talked with her about voluntary treatment. Walker replied, "We've talked about the need for continued treatment and she's indicated her intention to participate in continued treatment." Walker also said that appellant had cooperated with her treatment at Sacred Heart and was taking her medicine willingly. Sulliger then asked Walker, "And can you tell us what the plan has—if you talked about any further treatment, what that plan would be, what kind?" Walker answered, "That further treatment would include ongoing medications as well as outpatient counseling."

Walker was then examined by appellant's counsel:

"Q. Do you think she is in good enough shape that she could be discharged from the unit at this time?

"A. Soon. I don't know this afternoon. Potentially tomorrow.

"Q. Okay. Anything in particular you're looking for for that event to occur?

"A. Clarification of her outpatient plan and—that's the main concern."

Walker concluded:

"I believe there's been a reduction in the ideation. There's been a reduction in verbal expression of it, there's been a reduction in the sort of obsessional focus on it. Sometimes

when people clear they get—they get insight into the fact that the environment—it's upsetting to people in the environment when such things are verbalized and people choose to keep those things to themselves."

The state then called Jessica Danford, a registered nurse, who had been caring for appellant since her mental hold. Danford testified that appellant had been manipulative regarding patio smoking privileges, but that other than the issue of smoking, she had been cooperative in taking her medications and her symptoms had lessened.

At that point in the hearing, Sumner testified regarding an interview that he had had with appellant shortly before the hearing. He said that appellant told him that she did not remember actually firing the weapon and remembers nothing except a loud noise. Sumner also related that appellant continued to believe that her neighbors "have had [a] bad intent for her" and "she still wants to deal with the police about doing something about the neighbors there." He noted that appellant had been in possession of the firearm for about three years before the discharge incident occurred and had not "discharg[ed] it that we know of in an untoward manner." He verified, however, that appellant "still carries the basic suspicious and paranoid feelings about the next door neighbors and that that still is very much a part of what's going on here for [appellant]." However, when asked whether those feelings were the result of a mental disorder or "just something that's ingrain[ed] to her personality and the nature of the relationship or interrelationship with those neighbors[,]" Sumner replied, "I think—I don't want to split that hair." Sumner then observed that, apparently, appellant had been suspicious about people over a period of time and "[s]o something has happened here that's taken it further and it's—and I can't explain exactly what. Except I do believe that this is part and parcel of a mental disorder." Finally, Sumner testified that appellant told him that she did not want to hurt anyone.

The court also heard from appellant's mother, who said that appellant could return to Texas and live with her until a residence for appellant could be located. Appellant's mother also testified that appellant had adequate financial

resources to afford private treatment, and she assured the court that she would ensure that appellant would seek treatment. Finally, appellant's mother told the court that appellant's neighbors had been evicted.

After listening to the above testimony and appellant's statement, Sulliger rendered his report to the trial court. Earlier, Sulliger had made the following comment after listening to appellant's statement:

> "Well, I have concerns about some other neighbors too. I think [appellant]'s had problems with neighbors and I don't think that's just due to her mental disorder, I think that's been going on for some time. I don't think it's necessarily completely irrational. She has some logical—she has a logic to it and that has to do with the care of their animals."

In his report to the court, Sulliger found that appellant had a mental disorder, but that she was not dangerous to herself or dangerous to others, and that she was able to provide for her basic personal needs and was receiving care as was necessary for her health and safety. He also stated in his report, "It is my opinion that this person would * * * cooperate with and benefit from a program of voluntary treatment." He was thereafter questioned by the court:

> "Q. So your conclusion, Mr. Sulliger, is that she's not subject to commitment?
>
> "A. Well, with the caveats that we discussed, assuming that she follows through with those. I'm kind of swayed, you know, either way. I mean, if she was refusing, I would say she would be subject to commitment. It's that issue of whether she's voluntary or not."

In addition to the testimony from the witnesses and Sulliger's written opinion, the trial court was entitled to take into account appellant's statement in determining whether it was probable that she would participate in voluntary treatment. Appellant also told the court:

> "But, um—some of the things mentioned here I actually did experience people actually banging on my door and ringing my doorbell. I actually had a police officer on the line. Dispatch—I dialed 911 because my neighbor was screaming outside my door. And then when she left, her husband proceeded to come over, and in front of the whole

neighborhood, stand on the stoop away from the door using all types of profanity, cussing, hollering, and everything.

"And the only thing I have ever done is I have asked them to please keep their pet away from my door. Also, if they would please quit banging their car door onto my door. I have five door dings on my car. I'm very meticulous about everything that I own. And when I moved in there, all I had was one little piece of chip on the passenger's side door. Now I've got five of them. And I've gone out of my way to be overly nice.

"And, um—also, like I said, I had police on the phone, they heard part of the hollering and screaming and the doorbell ringing and stuff, and that's why they dispatched someone to my home.

"I chose not to take the matter into my own hands, to call the police. But it seems as I kept calling the police, the response kept getting a little less and less. So, um—yes, I was in fear of my life. I caught her husband lying to me. I've caught them—what am I supposed to do? Sit there and let these people call me names? You know. I'm supposed to just completely turn my back? You know, there is a limit to what one person is—should be allowed to take. Okay?

"And my intention wasn't to point a gun at either one of them, it's just that evening someone threw something at my door. It sounded like a rock. Okay? But I didn't even open my door for that. And then again that evening—this is all happening in one day. And then that evening, I heard somebody knock at my door. And I went to the door, and I looked through the peephole, and I asked: Who is it? They would not respond.

"But this description that I gave dispatch, and I did call 911, matches the description of the gentlemen who lives next door to me. Dark-haired male, slender build, about 150, 160 pounds. That's not my imagination, that's exactly how my neighbor looks. Okay? So I did all the right things.

"And I'm a single woman living by myself. Are you trying to tell me I do not have the right to protect myself? So— and, um—that's about it. But I did keep in communication with my mom. As a matter of fact, my mother was on the phone when I lay down the phone on the counter to ask who it was at my door. Okay? Someone was actually knocking at my door. All right? So it isn't just my word, I have her and

also dispatch that knows that that is true. Two times people have banged and knocked on my door."

Based on the above record, the trial court found:

"I find the patient suffers from a mental disorder. I do not find that she's dangerous to herself. I do find that she's dangerous to others. She expressed today to me unequivocally that her response to people being rude and intrusive is it's appropriate to fire a firearm into their apartment through the wall. That is [a] presently held dangerous opinion."

At that point, appellant interjected, "May I say something?" The trial court continued without permitting appellant to be heard:

"I find that she is able to take care of herself but she is not receiving such care as is necessary without our intervention. Therefore, she's committed to the Mental Health Division for a period not to exceed 180 days."[2]

Despite the above evidence, the majority concludes on *de novo* review that it is unable to find that appellant probably would seek voluntary treatment in the future. According to the majority:

"[T]he trial court had every reason to believe that such a disposition [treatment on a voluntary basis], in conjunction with an unsupervised out-of-state move, would undermine the probability that appellant would follow through with treatment. On *de novo* review, we agree with that assessment."

202 Or App at 339-40.

The majority relies on appellant's statement to the court that she "did all the right things" at the time of the incident in her apartment, which it says "showed a lack of insight

---

[2] After concluding that appellant should be committed, the trial court entertained a request for forfeiture of appellant's firearm and then commented:

"Now, that doesn't mean that the Mental Health Division cannot facilitate her move to Texas if that's what you think's appropriate. I have now put the case in your hands and what you do with it is up to you. But this does maintain at least some hold over her to ensure that she follows through with what they're planning. And if that means communicating with the mental health people in Texas to aid in monitoring that's—I have no position on that whatsoever."

that detracted from the probability that she would take seriously her need for treatment and follow through with it." *Id.* at 337. The majority also asserts that Sulliger "apparently was undecided whether appellant would obtain proper treatment" and that "Walker recommended a structured program that would be monitored by DHS." *Id.* at 338. Additionally, it observes that no specific plan had been developed at the time of the hearing to address her mental disorder. *Id.* at 338.

ORS 426.130(1)(b)(A)(ii) requires a court to draw a reasonable inference from the evidence in the record that predicts a mentally ill person's future actions with regard to the person's illness. The statute does not authorize a determination based on speculation or conjecture without an evidentiary basis because such a result constitutes an unconstitutional deprivation of personal liberty. Our opinion in *State v. Doe*, 116 Or App 18, 840 P2d 727 (1992), illustrates that principle. There, an issue arose similar to the issue here. The appellant argued that the trial court erred in committing him because there was no evidence that he was unlikely to participate in treatment on a voluntary basis. He pointed to his own testimony that he would continue to take medicine for his mental disorder and would seek treatment at a mental health clinic if he were admitted. We rejected his argument because of other evidence that was in the record. Both examiners in that case found that the appellant would not cooperate with voluntary treatment. In fact, he had a history of refusing to participate in outpatient treatment, and the record contained other evidence of the unlikelihood that he would participate, regardless of his expressed desire to do so. *Id.* at 21. The facts in *Doe* are in stark contrast to the facts here, and they illustrate why the majority errs. In *Doe*, the evidence about whether the appellant would seek treatment voluntarily was in conflict. In other words, there was evidence in *Doe* that permitted a reasonable inference that the appellant would not participate in voluntary treatment, despite his assurances to the contrary.

Here, the evidence that existed in *Doe* is lacking. The majority's conclusion is premised on a number of *non sequiturs*. For instance, it does not reasonably follow from the majority's reliance on prehospitalization facts that is, when appellant first called the police and then apparently took the

matter into her own hands under the belief that she had the right to protect herself—that in the future she would not seek voluntary treatment. Nor does it reasonably follow from Sulliger's and Walker's recommendations that appellant be involved in a structured program that, if released, she would refuse to enter into such a program when she returned to Texas. Similarly, it does not reasonably follow from the fact that no specific program had yet been developed at the time of the hearing that appellant would not voluntarily participate in such a program in the future. Also, nothing in ORS 426.130 requires an appellant to demonstrate that a specific, structured program is already in place.

Additionally, the majority asserts that "appellant's limited offer to participate in therapy must be viewed in the context of her previous failure to follow through with psychiatric treatment recommended by the Veterans Administration." 202 Or App at 338. Again, the majority overstates the import of the evidence in the record in that regard. First, appellant's "limited offer" was not "limited" at all. Rather, her entire statement in that regard at the hearing was as follows:

> "Oh, okay. I'm not opposed to having therapy. I would agree to that. That I wouldn't mind sitting down with someone once or twice a week and going over some of the things that are bothering me. And also, I'm not opposed to living close to family members if that's what it takes, moving back to Texas."

Moreover, there is no indication that appellant was, by stating a willingness to attend counseling once or twice a week, setting any kind of "limit" on the type of treatment to which she would be amenable. To the contrary, appellant's willingness to move to a different state "if that's what it takes" suggests that she was willing to drastically alter her life to obtain the necessary treatment.

Also, on the subject of appellant's medical history, her medical records contain the following entry:

> "PAST PSYCHIATRIC HISTORY: Unknown, though the patient makes a reference to having been prescribed lorazepam at some point in the past but states that she did not like it as she felt more anxious with that medication. She

also made vague reference to having been treated or possibly hospitalized for mental health issues while on active duty in the United States Army, 30 years ago."

In addition, an entry in the Notice of Mental Illness Emergency Hospitalization provides, "Pt. states she is depressed and was told by the Veteran's [sic] Administration to see a psychiatrist and has not done so." The above evidence does not reflect any history such as existed in Doe that would provide the basis for a reasonable inference that at the time of the hearing, appellant would not follow through in seeking voluntary treatment. At most, it suggests that appellant has suffered from mental health issues in the past.

Finally, the majority improperly dismisses appellant's mother's testimony that she would help appellant seek treatment in Texas. The fact that her mother was willing to assist appellant in seeking treatment makes it more likely that appellant (who also indicated a willingness to seek treatment) would actually do so. Yet the majority disregards that testimony out of concern that "appellant's relocation from Oregon and the concomitant dismissal of the case would place appellant beyond the scrutiny of mental health authorities." 202 Or App at 338. The majority's reasoning is circular; essentially, the majority concludes that the testimony of appellant's mother (and, for that matter, the testimony of Walker and Sulliger) that appellant should be released for outpatient treatment is unpersuasive because appellant would no longer be subject to the scrutiny of mental health authorities. If ORS 426.130(1)(b)(A) is to have any effect at all, evidence that an individual would seek voluntary treatment cannot be trumped automatically by concerns that the individual will be released.

When the evidence that is probative on the issue of whether appellant would probably seek voluntary treatment in the future is properly considered, it becomes apparent that the weight of that evidence preponderates in favor of an inference that she probably would seek treatment. Sulliger believed that appellant would cooperate with a program of voluntary treatment. He thought that appellant's feelings about her neighbors were not "just due to her mental disorder." He found her to be "logical and coherent—not tangential" at the time of the hearing. He noted in his report to the

court that Walker believed that appellant had improved and would be appropriate for outpatient treatment if she did not possess a firearm. His report recites that, during his interview in the hospital with appellant, "[w]e discussed voluntary treatment[,] and she indicated she would be willing to participate." At the end of the hearing, Sulliger declared in his report, "It is my opinion that this person * * * would cooperate with and benefit from a program of voluntary treatment."

Sulliger's opinion is supported by appellant's treating physician's testimony. Walker opined that appellant could be released from the hospital as soon as "[p]otentially tomorrow" and that involuntary commitment was unnecessary as long as appellant stayed in treatment and took her medicine. In Walker's view, all that needed to occur for appellant's release the following day was "[c]larification of her outpatient plan." At no point in her testimony did Walker opine that appellant would not voluntarily comply with a proposed outpatient treatment plan. She too testified that appellant had "indicated her intention to participate in continued treatment." At the end of her testimony, Walker was asked to assume that appellant had surrendered her firearm and had agreed not to make any effort to secure another weapon. Counsel then asked her, based on those assumptions, "[T]hen you think she'd be appropriate for outpatient treatment?" Walker answered, "I do."

Sumner's testimony also does not support the majority's conclusion that appellant would not seek future treatment voluntarily. He reinterviewed appellant after learning that she might seek treatment voluntarily. Although he thought after that interview that appellant "still carries the basic suspicious and paranoid feelings about the next door neighbors," he was unwilling to attribute those feelings to her mental illness. When asked if appellant's feelings were the result of her mental disorder or due to her personality style and the conduct of her neighbors, Sumner answered, "I think I don't want to split that hair."[3]

---

[3] I have not discussed witness Danford's testimony because she was not asked about appellant's willingness to participate in outpatient treatment.

The majority also implies that we should defer to the trial court's ruling because it "had the opportunity to observe appellant's demeanor[.]" 202 Or App at 339. Apparently, the implication is that the trial judge found that appellant's statements that she would seek treatment in the future lacked credibility. It could be argued that, after all, appellant had her day in court before a distinguished and veteran trial court judge, who had the opportunity to observe her first hand, and he, like any trier of fact, was not required to believe appellant. Moreover, the 180-day involuntary commitment period that began in October 2002 has long since expired, and the trial court apparently believed that an involuntary commitment was needed to protect the public, because, as it said,

> "[s]he expressed today to me unequivocally that her response to people being rude and intrusive is it's appropriate to fire a firearm into their apartment through the wall. That is [a] presently held dangerous opinion."

Judges, however, including the author of this opinion, are not infallible. Thus, the law imposes standards that must be satisfied by evidence before the remedy that the law affords is authorized. *De novo* review by appellate courts provides some guarantee that the law as enacted by the legislature will be followed. In this case, the trial court never made an express finding that appellant was not credible. In fact, it expressly found that she was "able to take care of herself[,]" a finding that is consistent with the findings of Sulliger who thought appellant would cooperate with a program of voluntary treatment. Rather, it is clear that the trial court's decision to commit appellant was prompted by an inference that it drew from appellant's statement: the inference that appellant had a "presently held dangerous opinion." That inference is not germane to the requirement of ORS 426.130(1)(b)(A)(ii).[4] Although it may be probative of whether appellant meets the statutory definition of mental illness, it does not follow from the satisfaction of that statutory definition that appellant would not seek treatment for her mental disorder in the future. Otherwise, the legislature would not

---

[4] In fact, appellant expressed her intention to follow up on her beliefs by contacting the police.

have created a discrete requirement for involuntary commitment in ORS 426.130(1)(b)(A)(ii).[5]

Apart from the facts of this case and the reason for this trial court's ruling, important policy issues are at stake in this case. The lawfulness of appellant's commitment turns on a prediction that appellant probably would not seek outpatient treatment in the future. As a result, she was deprived of her liberty, even though she was not tried and convicted of a crime, and even though she was willing and able to seek treatment voluntarily. Having been committed involuntarily for a single incident—and apparently for the first time in her life—appellant now has a stigma that will attach to her for the rest of her life. If she remains subject to Oregon law after this commitment, at least part of the requirements for the commitment of a chronically ill person are satisfied. Those requirements are less stringent than the requirements under which this commitment occurred, ORS 426.005(1)(d)(C), and could lead to future commitments because of her illness. All of these consequences follow because the majority fails to require a legally adequate evidentiary basis for its finding under ORS 426.130(1)(b)(A)(ii). This case demonstrates what occurs when courts do not strictly apply the statutes concerning involuntary commitment. In sum, the majority's reasoning sends the wrong signal to trial courts, and it results in the deprivation of substantial liberty interests guaranteed under the state and federal constitutions.

In a related general sense, this court reviews a number of involuntary commitment cases every month. On occasion, it appears from some of the decisions that we review that some trial courts tend to engage in a form of social engineering rather than strictly following the requirements of the law. As a former trial judge, I understand that it is tempting

---

[5] In the abstract, many people in our society hold opinions that others might consider "dangerous." However, the essence of a free society is that it entitles all of us to hold opinions that others might consider "dangerous" without the sanction of the deprivation of our liberty. The mental commitment statutes authorize the deprivation of a person's liberty when a person's dangerous opinion results from a mental disorder and causes that person to be a danger to others. As Sulliger said in his report, "[Appellant] clearly has been dangerous to others" because of "suspiciousness leading to paranoid delusions." But Sulliger also heard appellant's statement to the court and concluded that appellant, with the help of her mother, would seek treatment voluntarily.

to give mentally ill persons the medical help they may need when the requirements for involuntary commitment do not exist. Indeed, the court is in a position to give such a person help with his or her mental disorder, and at the same time, to remove a disruptive influence from the community. But that kind of judicial attitude presents a slippery slope for courts, because the state and federal constitutions recognize the priority of preserving personal liberties in such cases. The tension between the protection of personal liberties and the provision of medical help to persons with mental disorders can be relieved if courts strictly adhere to the statutory requirements for involuntary commitment and ensure that there is an evidentiary basis that satisfies each of those requirements.

In summary, even if the evidence in this case supports a finding by clear and convincing evidence that appellant was dangerous to others because of her mental disorder, it preponderates in favor of a finding that she was willing and able to enter into treatment voluntarily and probably would have done so, if given that opportunity. If, under these circumstances, the evidence does not demonstrate that appellant probably would seek voluntary treatment, it is difficult to posit any scenario in which a person adjudged to be mentally ill would be released under ORS 426.130(1)(b)(A). When the statutes governing involuntary mental commitments are not followed according to their terms, the result necessarily is an unconstitutional deprivation of liberty. That is what occurred in this case, and that is why we should all be concerned about any person who suffers appellant's fate. After all, mental illness does not discriminate, and anyone could find himself or herself in a similar predicament.

I dissent for the reasons expressed above.