154 P.3d 141 (2007)
211 Or. App. 181
In the Matter of D.F., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
D.F., Appellant.
05MH098; A128172.
Court of Appeals of Oregon.
Argued and Submitted November 2, 2006.
Decided February 28, 2007.
*142 James A. Palmer, argued the cause and filed the brief for appellant.
Benjamin R. Hartman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN and ORTEGA, Judges.
LANDAU, P.J.
Appellant appeals an order of involuntary civil commitment, arguing that the trial court erred in concluding that he suffers from a mental disorder that renders him a danger to himself or others or unable to provide for his basic needs, ORS 426.005(1)(d), and that he is unwilling, unable, or unlikely to participate in treatment voluntarily, ORS 426.130(1)(b)(A). On de novo review, State v. Hitt, 179 Or.App. 563, 565, 41 P.3d 434 (2002), we reverse.
Appellant is a 53-year-old man who, until recently, had worked for several years as a heavy-equipment operator for Douglas County. He was initially hospitalized after he made statements to coworkers and others in which he threatened to kill his physician and one of his work supervisors.
Appellant has a history of memory and other cognitive problems. He was tested for Alzheimer's in the early 1990s, but those tests were negative. He was more recently diagnosed with a possible cognitive disorder, including the possibility of incipient dementia, although a recent MRI did not reveal brain abnormalities. Appellant also has a history of making statements about using his shotgun to "clean out" the county building where he was employed. Appellant owns several guns.
In the period leading up to his hospitalization, appellant was divorced after 30 years of marriage and was reassigned at work because of several incidents in which he was apparently unable to understand or remember basic directions. As a result of those incidents, he was put on administrative leave and then reassigned to different duties. He was no longer allowed to operate heavy machinery.
Appellant was angry about being reassigned. In one incident, appellant, referring to a supervisor, told a coworker that "if I'd had my shotgun I'd have shot him today." In another incident, appellant became incensed when the physician who examined him failed to declare him fit to return to his position at work. He told a coworker that the doctor was "going to die." He also made similar threats in a phone message that he left for his union representative:
"I'm never going back to that bitch doctor. She is dead. The county's hands are tied now. The union should have intervened sooner or this never would have happened. I'm never going to see that bitch again. She's dead, I'm telling you, and I'm going to go show these people what a threat can really do."
The union representative informed county officials about the threat, and appellant was hospitalized that day.
While hospitalized on a five-day hold, appellant told a precommitment investigator that he did not remember making specific threats, saying that "I hope I didn't say that," but that he remembered being angry. The precommitment investigator found that, although appellant exhibited appropriate and courteous behavior while interviewed, his *143 judgment was impaired by "impulsive threats and memory deficits."
Several witnesses testified at appellant's commitment hearing. Dr. Tavakoli, a psychiatrist who had evaluated appellant, diagnosed him as suffering from a mental disorder, specifically, an "adjustment disorder with mixed emotional disturbance and behavioral disturbance." Tavakoli explained that that meant that appellant had suffered through traumatic experiences in his work and personal life, but was reacting "in a way that is sort of inappropriate" and "with emotions that are very strong." Tavakoli also said that appellant suffered from an anxiety disorder, such that he gets so anxious that he is unable to think clearly.
Asked if he presented a danger to others, Tavakoli said that in his current state at the hospital, appellant was "not a danger to anybody" but that "pressured enough in certain situations he might react inappropriately." Tavakoli explained that appellant's outbursts were related to the mounting pressure from the uncertainty with his position at work and "the pressure just built up * * * and he finally exploded." Tavakoli added,
"[H]e may react that way in a similar kind of situation again. Who knows.
"* * * * *
"[H]e could. He has made threats. He has not acted on them. He could threaten somebody again under similar circumstances, put under enough pressure that just  he could. Anybody could."
Tavakoli also added that he believed appellant should not be allowed to have access to a gun.
Tavakoli testified that appellant had started taking a new medication and that he was participating in psychotherapy and "doing really well" in group sessions. Tavkoli said he believed that appellant could be trusted to come in for future testing and evaluation on a voluntary basis.
Two of appellant's coworkers, Wulff and Leming, also testified at the hearing. They each described some of the instances at work in which appellant had been unable to follow directions and that had precipitated appellant's reassignment, and how appellant was frustrated after months of trying, without success, to get his job back as a heavy equipment operator. They also described the incidents in which appellant had made remarks about shooting his supervisor and about how his doctor was "going to die." Both of the coworkers noted that appellant had in the past made statements about how he was going to "clean out" the courthouse with his shotgun, but that they had not taken those comments as sincere threats. In contrast, the coworkers said, appellant's more recent threats seemed to be more serious.
Appellant's ex-wife, Enlow, also testified at the hearing. Enlow testified that, at some unspecified earlier point in time, appellant had undergone testing because of difficulties he was having with memory loss, anxiety, and anger issues. She also said that during their marriage, appellant had threatened to kill her if she ever left. She said she never took that seriously but saw him as "venting." She said that appellant's more recent threats, however, had taken on a different character, that they seemed to be getting "closer together and more intent." She said that he has a "mental issue that needs to be dealt with." Asked if she believed appellant would willingly engage in treatment if he were to be released from the hospital, Enlow said that she believed he would go to the treatment on his own.
Appellant also testified at the hearing. Asked if he remembered making threats, appellant said he remembered "being angry. I probably could not quote verbatim what I said. I feel ashamed of what I said * * * but I remember vaguely some instances, yeah, of (inaudible) frustration * * *." Appellant testified that he did not intend to act on the statements, and that he had never taken any steps toward acting on any of the threats. He repeatedly expressed his willingness to engage in treatment:
"[T]hey've got an excellent rehabilitation program here, excellent staff, and I realize[] my wrong by what I said and I would never act on what I said. I feel ashamed but  but they have an excellent program here and I would never, ever harm someone * * *.
"* * * * *

*144 "[T]hey've got a program afterwards that if I am released that I am  I told them more than once that I am willing to go through. Whatever it takes. They've got an excellent staff here and an excellent  they have an excellent thing going here I did not know existed. I realize I found out the hard way, but they have an excellent staff here and I'm glad I'm going through it.
"* * * * *
"I just want to go back to just a normal life and be a productive citizen. I want to work. I don't want to  I don't want to threaten anybody, don't want to harm anybody. I've learned that I've had stuff bottled up and I've made a mistake in the way of having the steam pop off the tea kettle the wrong way."
The mental health examiner who was present at the hearing concluded that appellant suffers from a mental disorder that renders him a danger to others. In his report, the examiner described appellant as friendly and cooperative, with good social skills, but also as "agitated, intense, driven [and] irritable." The expert also indicated, on a check-the-box form, that appellant would cooperate with, and benefit from, a program of voluntary treatment.
In his closing statement, appellant's lawyer argued that the state had failed to meet its burden of showing that appellant was a danger to others. Counsel also noted that, "[i]n the alternative, [appellant] is readily capable and seems amenable to doing any type of outpatient programming. So in the alternative I would ask for the release and do the program on his own."
The court ruled that appellant should be committed to the custody of Department of Human Services, explaining that the evidence "just barely met" the clear and convincing standard showing that appellant was a danger to others. The court added,
"[A]s far as how you're  you're managed here, I don't know what you have in mind for him but that's not my decision. I would hope that you get out of here ASAP. That's my hope. And I think probably that's what will happen but I can't guarantee that."
The court then issued a commitment order, which indicated that the court had found by clear and convincing evidence that appellant was, as the result of a mental disorder, dangerous to others; the order did not note any explicit findings with respect to whether appellant would be willing and able to participate in treatment on a voluntary basis, or whether he was likely to do so.
On appeal, appellant argues that the court erred in ordering his involuntary commitment in two respects. First, appellant contends that the state failed to prove by clear and convincing evidence that he suffers a mental disorder that renders him a danger to others. Second, he argues that the record shows that he was willing and able to participate in treatment on a voluntary basis, and that he was likely do so. Because it is dispositive, we begin and end our analysis with appellant's argument that he should have been released because of his willingness and ability to voluntarily participate in treatment.
As an initial matter, the state argues that we should not reach the merits of that issue because it is not preserved. The state acknowledges that appellant expressly requested that he be allowed to engage in treatment on a voluntary basis, and asserted both in testimony and in closing argument that he was willing and able to do so. The state, however, contends that such a request is not sufficient to preserve a claim that the trial court erred in denying it.
We disagree. In context, counsel's closing argument clearly raised the issue whether the record is sufficient to support an order of civil commitment for two reasons. Counsel first argued that the state had failed to prove by clear and convincing evidence that appellant was a danger to others. He then argued "[i]n the alternative," that he is "readily capable" and "amenable to doing any type of outpatient programming" and concluded with the request, "I would ask for the release and do the program on his own." The fact that the statement employed the word "ask" cannot be dispositive. The rule requiring preservation of error is intended to provide the trial court an opportunity to avoid *145 error and thus to obviate the need for an appeal, State v. Wyatt, 331 Or. 335, 343, 15 P.3d 22 (2000), as well as to ensure that "the parties are not taken by surprise, misled, or denied opportunities to meet an argument," Davis v. O'Brien, 320 Or. 729, 737, 891 P.2d 1307 (1995). In this case, the court was aware of appellant's contention that he was eligible for voluntary treatment, and the state cannot claim surprise or lack of an opportunity to respond. We therefore turn to the merits of appellant's contention.
Appellant argues that, under State v. Rainbolt, 182 Or.App. 668, 50 P.3d 1228, adh'd to as modified on recons., 184 Or.App. 661, 57 P.3d 902 (2002), to justify his commitment, the state was required to show, by a preponderance of the evidence, that he was unwilling, unable, or unlikely to voluntarily participate in mental health treatment. According to appellant, the state did not meet that burden; to the contrary, appellant argues, the evidence shows plainly that he was willing to participate in treatment on a voluntary basis and that he was capable of doing so.
The state responds that the portion of Rainbolt stating that the state has the burden of proof on this issue is dictum and is incorrect. According to the state, the law requires appellant to show that he is willing and able to participate in treatment on a voluntary basis, and appellant did not meet that burden. In the state's view, the evidence in the record shows that, whatever appellant's intentions may be, he is unable to follow directions consistently, and his willingness to participate in treatment was premised upon an unrealistic expectation that he would be able to return to his old job.
ORS 426.130(1)(b)(A) provides that the judge
"[s]hall order the release of the individual and dismiss the case if:
"(i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and
"(ii) The court finds that the person will probably do so."
We have construed that statute to mean that release is mandated if the mentally ill person is willing and able to participate in treatment on a voluntary basis and the court is satisfied that he or she will probably do so. Rainbolt, 182 Or.App. at 672-73, 50 P.3d 1228. The statute does not require a court to make a direct inquiry of the mentally ill person about his willingness to participate in treatment, but it must weigh the evidence in the record in making that determination. State v. Lawrence, 208 Or.App. 212, 218, 144 P.3d 967 (2006). Whether a mentally ill person probably will participate in treatment on a voluntary basis is a "dispositional" determination to which the court applies a preponderance of the evidence standard of proof. State v. Lott, 202 Or.App. 329, 337, 122 P.3d 97 (2005), rev. den., 340 Or. 308, 132 P.3d 28 (2006).
In Rainbolt, we reversed an order of civil commitment, initially because "the record lacks clear and convincing evidence that appellant is unwilling or unable to cooperate with and benefit from voluntary treatment with the help of his family." 182 Or.App. at 674, 50 P.3d 1228. The state petitioned for reconsideration, on the ground that the proper burden of proof is a preponderance of the evidence. We agreed and on reconsideration concluded "that the state did not prove by a preponderance of the evidence that appellant is unwilling or unable to cooperate with and benefit from voluntary treatment." State v. Rainbolt, 184 Or.App. 661, 662, 57 P.3d 902 (2002). In both cases, we expressly assumed that the state bears the burden of proving those matters. Subsequently, in Lott, we observed that our assumption in Rainbolt may or may not have been correct. 202 Or.App. at 337, 122 P.3d 97. We determined that it was unnecessary to resolve that question, however, because, on de novo review, it was clear to us that a preponderance of the evidence supported the trial court's order of commitment. Id.
Likewise, in this case, we need not resolve the issue identified in Lott about which party bears the burden of proof with respect to whether an allegedly mentally ill person is willing and able to participate in treatment on a voluntary basis. Under either allocation of the burden of proof, on de novo review, a *146 preponderance of the evidence supports appellant's contention.
Before turning to the record in this case, we pause to mention one further principle pertaining to the review of that record. A court is not required to release a person merely because he or she has expressed a willingness to engage in treatment voluntarily. In State v. Doe, 116 Or.App. 18, 21, 840 P.2d 727 (1992), for example, we affirmed the commitment of a person who asserted that he was willing to voluntarily engage in treatment. In that case, however, two hearing examiners had found that the appellant would not cooperate with voluntary treatment. In addition, the evidence showed that he had a history of refusing to participate in outpatient treatment. Id.
But when a person's expressed willingness and desire to participate in treatment is substantially corroborated by other evidence in the record, involuntary commitment is not appropriate. Thus, for example, in Rainbolt, we reversed an order of commitment where the appellant's testimony that he was willing to participate in voluntary treatment and take his medications was corroborated by the testimony of family members that they were willing to assist him with outpatient treatment and by the testimony of one of two court-appointed examiners who found that the appellant "would cooperate with and benefit from a program of voluntary treatment." 182 Or.App. at 671, 50 P.3d 1228.
With the foregoing principles in mind, we turn to the record in this case.
First and foremost, appellant himself was enthusiastic about his treatment and asserted his willingness to continue with it. Appellant testified to his willingness to engage in treatment in no uncertain terms, saying that he was willing to do "whatever it takes" and described the program as "an excellent thing * * * I did not know existed. I realize I found out the hard way, but they have an excellent staff here and I glad I'm going through it."
Second, appellant's claims that he was willing and able to attend treatment on his own were corroborated by the testimony of the psychiatrist who had been treating him and by appellant's ex-wife, who had lived with appellant for 30 years. Both witnesses testified that appellant could be trusted to return for evaluation and treatment. The psychiatrist indicated that appellant was responding very positively to his current treatment program. In addition, the mental health examiner appointed by the court indicated in his report that appellant would benefit from and cooperate with treatment on a voluntary basis.
The state presented virtually no evidence that might refute appellant's contention that he is willing and able to participate voluntarily in his treatment. The state argues that appellant's ability to engage in treatment voluntarily could be compromised by his forgetfulness and that his apparent willingness is only predicated on his belief that treatment will allow him to return to his old job. That possibility, however, is not sufficient to overcome the evidence that appellant was willing and able to participate voluntarily.
We conclude that the record shows, by a preponderance of the evidence, that appellant was willing and able to voluntarily participate in treatment, and that he was likely to do so. It follows that the trial court erred in ordering his civil commitment.
Reversed.